# EXHIBIT A

FILED
JUN 29 2011      3:55pm
MICHAEL K. JEANES, Clerk
By _____M. Mejia_____
Deputy

1

2    **IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA**

3    **IN AND FOR THE COUNTY OF MARICOPA**

4    **KATHI ANN SHARPE,**                    **CASE NO: CV 2010-096145**
                                             Amended ~~Complaint~~
5                    **Plaintiff,**            **MOTION**
                                             1. **Breach of Contract**
6            **v.**                            2. **Negligence**
                                             3. **Wrongful Foreclosure**
7    **FAIRBANKS CAPITAL CORP., a Utah**      4. **Intentional Infliction of**
                                                **Emotional Distress**
8    **corporation n/k/a SELECT PORTFOLIO**
     **SERVICES, INC., a Utah corporation.**
9
                     **Defendants.**
10

11   To: The Honorable Judge Karen A. Potts
12   Re: Case No. CV 2010-096145

13   Kathi Ann Sharpe
     vs.
14   Fairbanks Capital Corporation
     Re: Extension of Time for Service
15

16   Dear Honorable Judge Karen A. Potts,

17       1.    My name is Kathi Ann Sharpe. I currently live in Phoenix, AZ. I am a single
18   mother of five children. ██████████████. I am currently employed by the Kyrene School District
19   as a Certified Substitute Teacher. I have been employed by the school district for over nine
     years.
20

21       2.    I am filing this action, complaint, lawsuit against Fairbanks Capital
22   Corporation, n/k/a/ Select Portfolio Servicing, as a Reserved Claim and Defense to their
     violation of the USA vs. Fairbanks Capital Corporation Civil Action No. 03-12219-DPW
23   and the Alanna L. Curry, et al., individually and on behalf of all others similarly situated,
     Class Action Civil Action No. 03-10895-DPW. These violations of the FTC Order and the
24   Class Action Settlement Agreement, led to the wrongful foreclosure that took place on

September 21, 2004. The property was located at 12641 S. 34th Place, Phoenix, Arizona 85044. The Reserved Claims and Defenses, either affirmatively or defensively, can be asserted in an effort to defeat any pending or future foreclosure (whether judicial or non-judicial). The Injunctive Relief provision of the FTC Order and the class settlement require Fairbanks to adopt practice changes, as set out in the private Settlement Appendix 1 - "Default Resolution Program" (DRP) and Appendix 2 - "Operational Practices Agreement" (OP). Both of these programs are to remain in effect for a minimum of 5 years. Significantly, Fairbanks' customers can raise as a defense to foreclosure Fairbanks' failure to comply with these obligation( See Exhibit 29).

3.     The Court in Arizona has adopted the same standard for wrongful foreclosure as other states including Georgia, Missouri, Texas and California. The elements are (1) a legal duty owed to the Plaintiff by the foreclosing party (2) a breach of that duty (3) a causal connection between the breach of that duty and the injury the Plaintiff substained, and (4) damages. (See Contreras v. US Bank, No. CV09-0137-PHX-NVW.( Dist. Ariz. 2009). Fairbanks Capital Corp. violated the good faith and fair dealing condition implied in contracts with their breach of this contract(the Settlement Agreements).

4.     The Notice of the Proposed Settlement Agreements were mailed to Fairbanks' customers where Fairbanks' records indicated that their home mortgage loan was serviced by Fairbanks between January 1, 1999 and December 10, 2003 (the class period).

5. Released Claims, means collectively, all claims, demands, rights, liabilities, defenses, counterclaims and cross-claims, third-party claims, set-offs. rights of recoupment and causes of action of every nature and description whatsoever for any losses, damages, harms, injuries, statutory penalties, consequential or incidental damages,; punitive damages, or other monetary or non-monetary relief that result, concern or arise from or in connection with (a) the transactions or occurrences or series of transactions or occurrences alleged in the Consolidated Class Action Complaint; (b) the acts or omissions of Fairbanks or of any Fairbanks-Related Party in connection with Fairbanks' Servicing of the Serviced Loans related to the transaction or occurrences or series of transactions or occurrences alleged i n the Consolidated Class Action Complaint; (c) Fairbanks' Servicing of a Serviced Loan that ever was in Default or treated by Fairbanks as being in Default; or (d) any charge, assessment or collection of a prepayment charge, fee or penalty in Massachusetts, Alabama or West Virginia, or in violation of law or contract. The Released Claims shall include, without limiting the generality of the foregoing, claims, demands,

rights, liabilities, and causes of action that are: known or unknown; matured or unmatured; now existing or coming into existence in the future; at law or in equity; before a local, state or federal court ,tribunal, administrative agency, commission, arbitrator or arbitration panel, or other adjudicative body; now liquidated or unliquidated; concealed or hidden; asserted or might have been asserted, provided, however, that such are encompassed by the first sentence of this definition. The Released Claims also shall include, without limiting the generality of the foregoing, all claims, rights and demands under any federal, state or federal statute, rule, or regulation, or under the common law or contract, provided, however, that such are encompassed by the first sentence of this definition. The Reserved Claims and Defenses shall be a specific exception to the scope of the Released Claims.

6.    Reserved Claims and Defenses, means the following claims and defenses that are excepted from the Release:

(a)  any claims or defenses that a Settlement Class Member asserts, affirmatively or defensively, with respect to Fairbanks' Servicing in an effort to defeat any pending or future

(b)real estate foreclosure action (whether judicial or nonjudicial), including those related to the Servicing practices covered by this Agreement, shall be unaffected by the Release in connection with such action (b) any claim arising from an alleged violation of 12 U.S.C 2605, but only with respect to requests there under made entirely after the Preliminary Approval Date.

7.    What were these lawsuits about? These lawsuits concern Fairbanks' conduct in handling mortgage loans, a process known as servicing the loan (see Exhibit 28). The major focus of these lawsuits involves how Fairbanks serviced loans that were in default or that it treated as being in default. The lawsuits generally allege that Fairbanks assessed late fees and other charges even though borrowers' monthly payments were not late charged fees that were not authorized; obtained property insurance at the borrowers' expense when the borrower already had insurance in place and engaged in improper collection practices and took actions to foreclose on borrowers' properties when not warranted by law or contract.

8    The Complaint of the FTC/HUD (See Exhibit 33) lawsuit against Fairbanks Capital Corp and Fairbanks Capital Holding Corp., alleged that the Defendants violated such acts as: The Fair Debt Collection Practices, Fair Credit Reporting Act and RESPA. The Class Complaint (See Exhibit 34) alleged that Fairbanks has engaged in a pattern and practice of uniform nationwide unfair, unlawful and deceptive business practices in its

Servicing of residential mortgage loans, and that Fairbanks has engaged in other conduct that breaches statutes, contracts, and common law. The Class also alleges that Fairbanks' misconduct has resulted in overpayment of fees for borrowers, exacerbated delinquencies and caused unnecessary or illegal foreclosures. Injunctive Relief was sought to prevent additional misconduct in the future.

9.     The lawsuits also involve allegedly improper "prepayment penalties". These are fees provided for in the borrower' mortgage or note that a lender can impose when a borrower pays off his or her loan (usually because of a refinancing) before a specified period of time has elapsed. Some state laws restrict when and how a lender may impose prepayment penalties on borrowers. The lawsuits allege that Fairbanks violated those state laws or the mortgage terms in certain circumstances. The lawsuits also concern certain other alleged misconduct by Fairbanks.

10.     Fairbanks Capital Corporation, faced with numerous individual and class action lawsuits and FTC and HUD enforcement actions, Fairbanks decided to enter into a global settlement, with a private settlement agreement and FTC Order negotiated contemporaneously and cooperatively.  Curry v. Fairbanks Capital Corp., filed in the District of Massachusetts, consolidates and settles 37 separate lawsuits; and the FTC consent order was filed in a related action in the same court. The Class Settlement provides: "This Settlement and the FTC Agreement are intended to jointly comprise a global settlement providing for consumer redress throughout the United States. The two settlements were negotiated simultaneously, and are inextricably" intertwined". The lawsuits seek money damages and other relief from Fairbanks and companies that Plaintiffs believe have responsibility for Fairbanks' conduct.

11.     There were two main cases. First, on November 12, 2003, the United States, acting on authority of the FTC and the Department of Housing and Urban Development , filed a complaint against Fairbanks and an affiliate. The FTC Complaint charges that Fairbanks' loan servicing practices violated Section 5 of the Federal Trade Commission Act, the Fair Debt Collection Practices Act and other laws.  Second, at about the same time, the Plaintiffs filed a Consolidated Class Action in the Curry case ("National Class Case"). The National Class Case alleges that Fairbanks violated the Fair Debt Collection Practices Act and engaged in other wrongdoing in loan servicing. The National Class Case includes various claims previously made in a number of other class action lawsuits filed in various courts.

12.     Fairbanks agreed to settle both of the cases. On November 12 and 14, 2003, the FTC and Plaintiffs submitted to the Court separate but related proposed settlements. The complete details of the proposed settlement of the of the National Class case are in the Settlement Agreement . The complete details of the proposed settlement of the FTC case are contained in a "Stipulated Order" in the FTC Order that the Court has preliminarily approved and which is on file in the FTC case. The proposed   Settlement of the National Class Case must be finally approved by the Court, and subject to the terms of the Settlement Agreement and the FTC Order,  the proposed Settlement will become effective only if the settlement of the National Class Case are both approved by the court. The Fairness Hearing took place on May 12, 2004 and was approved.

The opt-out class consists of all persons with loans serviced by Fairbanks between January 1, 1999 and December 10, 2003 who:

. were in default or treated as being in default by Fairbanks and incurred or were assessed late fees or default-related fees, including "corporate advances";

. were affected by default-related conduct:

. incurred or were assessed certain prepayment penalties in violation of law or contract; or

. were otherwise affected or whose loans were otherwise affected, by one of the "Covered Practices".

The private class settlement releases class members' claims and defenses relating to (a) the transactions alleged in the Class Action Complaint; and (b) the acts or omissions of Fairbanks or Fairbanks-related party in connection with the servicing of class member's loans.

13.     The Settlement involved three forms of relief:

A.     Redress Fund. A $40 million dollar redress fund for the benefit of certain members of the class who timely returned valid claim forms and who did not timely exclude themselves from the Settlement. $5 million will be distributed to persons whom it is determined have lost their homes to foreclosure as a result of improper loan servicing conduct by Fairbanks. Class members who have lost their homes to foreclosure may make a claim against both portions of the Redress Fund. In order to receive any money from the Redress Fund, you may not exclude

yourself from the Settlement and you will need to submit a claim form and execute a release. Every Class Member who was harmed and that files a timely, valid claim form will receive at least some distribution from the Redress Fund. In addition, if you are a Class Member who paid a prepayment penalty, you will be eligible to receive a refund of a portion of any amount of the prepayment penalty that was in violation of law or contract from this Redress Fund.

If you are a Class Member whose loan was ever in default (or Fairbanks treated it that way) you will be eligible to receive money from the Redress Fund in proportion to the amount of money in late fees and other default-related fees that you paid or were assessed to your loan account or other harm that you suffered from Fairbanks' default-related conduct.

B. Reverse or Reimburse. Reimbursement of certain charges in full (if previously paid) or to reverse such charges. Reimbursement, where applicable will be in cash. There are no claim forms for this process. The benefits of the Program will not be given to persons who choose to exclude themselves from the Settlement.

C. Practice Changes. Will apply to all borrowers whose loans are serviced by Fairbanks.

14. Claims Procedure: Claims notices and claim forms were to be mailed to class members at the end of February, 2004. There are three separate claim forms; "Late fees/Default Related Fees", "Prepayment Penalty", and "Foreclosure." Class members must submit claim forms postmarked by April 24, 2004. The opt-out deadline is April 9, 2004. A hearing on final approval of the class settlement will be held in Boston on May 12, 2004. See Exhibit 30.

15.    Injunctive Relief and Practice Changes:

The class settlement and the FTC Order require Fairbanks to adopt significant practice changes, as set out in the private Settlement Appendix 1 – "Default Resolution Program" (DRP) and Appendix 2 – "Operational Practices Agreement" (OP). Both of these programs are to remain in effect for a minimum of 5 years. See Exhibit 28. Significantly, Fairbanks' customers can raise as a defense to foreclosure Fairbanks' failure to comply with these obligations.


No claim to enforce either the DRP or the OP provisions of the Settlement Agreements shall be brought other than in the Court in a proceeding to enforce this Agreement, provided however that an action, claim or defenses based on the DRP or the OP may be

raised as a defense to an individual foreclosure and will be treated like a Reserved Claim and Defense under this Agreement.  Plaintiffs and Settlement Class Members, hereby covenant not to sue Fairbanks and/or the Fairbanks Related Parties regarding any of the Releases Claims except for the right to assert the Reserved Claims and Defenses.


Servicing defined under the Settlement Agreements means receiving any scheduled monthly payments from a consumer pursuant to the terms of any loan, including amounts for escrow accounts, and making the payments of principal and interest and such other payments with respect to the amounts received from the consumer as may be required pursuant to the terms of the loan and includes any related loan servicing activity such as the administration of loan accounts, the collection of loan payments, the foreclosure of real property, the use of consumer reports and the furnishing of information to consumer reporting agencies, and the collection or imposition of fees in relation to any of the foregoing.  Servicing shall also include, without limitation, all activities undertaken by Fairbanks or by a person acting on its behalf or in conjunction with Fairbanks in connection with the administration of a loan account.  Servicing shall also include, but not be limited to, all activities undertaken (or failed to be undertaken) with respect to an account that is in Default or treated as being in Default; to each of the Covered Practices; and to the protection of the interests and rights of the servicer, investor, trustee or beneficiary of the loan.


Violations of the FTC Order   03 - 12219 DPW

Violations of the Curry/Class Settlement Agreement 03 – 10895 DPW

These violations listed below are to serve as evidence that Fairbanks violated the Settlement Agreement.


16. Injunctive Relief  (See Exhibit 33)

Section I

IT IS THEREFORE ORDERED THAT Defendants, and each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, directly or through any cooperation, subsidiary, division, or other device, are hereby permanently restrained and enjoined, in connection with the servicing of any loan, from:

C.    Misrepresenting, expressly or by implication, any amount that a consumer owes; when Fairbanks wrongfully foreclosed on me, I had formally and properly rescinded my loan in July 2004. Fairbanks ignored my rescission for over eighty days, demanded arbitration in February 2004. Withdrew their demand in March 2004, and started the foreclosure proceedings. There was never any "tender" amount discussed. Since there was never a ruling by a "decision-maker" as to the validity of my right of rescission claim, the amount owed was in dispute.

D.    Misrepresenting, expressly or by implication, that any fee is allowed under the loan instruments, permitted by law, or imposed for services actually rendered; when Fairbanks wrongfully foreclosed on me, there were numerous fees paid.

E.    Misrepresenting, expressively or by implication, the amount, nature, or terms of any fee or other condition or requirement of any loan

**Section III**

IT IS FURTHER ORDERED that Defendants, and each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby permanently restrained and enjoined, in connection with the servicing of any loan, from assessing and/or collecting any fee unless it is for services actually rendered and is a) expressly authorized, and clearly and conspicuously disclosed by the loan instruments and not prohibited by law; b) expressly permitted by law and not prohibited by the loan instruments; or c) a reasonable fee for a specific service requested by a consumer that is assessed and/or collected only after clear and conspicuous disclosure of the fee is provided to the consumer and explicit consent is obtained from the consumer to pay the fee in exchange for the service, and such fee is not otherwise prohibited by law or the loan instruments. Since my loan was in dispute regarding my right of rescission claim, what amount in fees was Fairbanks allowed to collect?

**Section IV**

IT IS FURTHER ORDERED that Defendants, each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby permanently restrained and enjoined, in connection with the servicing of any FHA mortgage loan, from assessing and/or collecting any fees prohibited by FHA statutory, regulatory, or written handbook requirements. Fairbanks assessed many fees in violation of my loan documents.

Section V

IT IS FURTHER ORDERED that, for five (5) years after the date of entry of this Order, Defendants, and each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby permanently restrained and enjoined, in connection with the servicing of any loan, from assessing and/or collecting the following fees:

A.    Fees for demand letters or any other collection letters or notices; Fairbanks was not entitled to collect any demand fees or other fees since my right of rescission claim was in the dispute status. When the foreclosure actions, began in March 2004, under Section XII(b) confirmed that the consumer has not been subject to any of the acts or practices prohibited by this Order, the loan instruments , or law, or if such acts or practices have occurred, that Defendants have remedied them. The foreclosure proceedings were in violation of this provision. They shouldn't have been any fees since the loan was noticed for rescission, Until the rescission dispute was resolved, I was not to be assessed any fees.

B.    Attorney's fees, provided that defendants may impose reasonable attorney's fees if: (1) the fees are necessary to process a foreclosure sale of the property or are otherwise permitted fees under Section III of this Order. With the right of rescission claim in dispute, there was a possibility that I would be receiving attorney fees for the failure of Fairbanks to honor my rescission claim. If my TILA right of rescission claim was valid, and the loan successfully rescinded, I would be afforded attorney fees. WHT WOULD Fairbanks be entitled to attorney fees when the rescission claim was not resolved.


Section VI

IT IS FURTHER ORDERED that nothing in this Order shall permit the Defendants to impose any fee or take any other action that is prohibited by any state or federal law or regulation and/or prohibited by the loan instruments and/or other contractual agreement with the consumer. Fairbanks ignored the mandatory arbitration clause in the loan document. They failed to file a declaratory action, if they disputed my right of rescission. I rescinded my loan under the TILA for the failure of the lender, assignee to provide me with a proper, accurate , notice of the right of the right to cancel and accurate material disclosures. There had been no dispute resolution at this point since Fairbanks withdrew from the mandatory arbitration, that was provided for in the loan agreement. See Exhibit .

In Large vs. Conseco, the 9th Circuit ruled, that until a decision-maker has made a decision, the borrower has only advanced their rescission claim.


### Section VII

IT IS FURTHER ORDERED that Defendants, and each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby permanently restrained and enjoined, in connection with the servicing of any loan that was in default at the time it was obtained by Defendants, from : See Exhibit 33 pg. 13. Fairbanks violated all the provisions of this section of the Order Preliminarily Approving Stipulated Final Judgment and Order as to Fairbanks Capital Corp. and Fairbanks Capital Holding Corp.


### Section VIII.

IT IS FURTHER ORDERED that Defendants, and each of them, their officers, employees, agents, representatives, all other persons or entities in active concert or participation with them who receive actual notice of this order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby permanently restrained and enjoined , in connection with the servicing of any loan from: See Exhibit 33 pg. 14.  Fairbanks violated all of the provision of this section of the Order Preliminarily Approving Stipulated Final Judgment and Order as to Fairbanks Capital Corp. and Fairbanks Capital Holding Corp.  When I tried to obtain refinancing for the subsequent " tender" offer to Fairbanks, I was told by two lenders that there was a "foreclosure" pending and that I was severely in arrears in my loan obligation.  Nothing was reported to the credit agency, that my loan was in dispute status and that by trying to refinance I would in incur "subprime" financing and a prepayment penalty to get out of the loan.  It was going to be super expensive to refinance this loan, due to the unresolved right of rescission claim and the foreclosure status.


### Section IX.

IT IS FURTHER ORDERED that Defendants, and each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby

permanently restrained and enjoined, in connection with the servicing of any loan, from failing to comply with RESPA, 12 U.S.C. 2601-2617, as amended, or its implementing Regulation X, 24 C.F.R. Pt. 3500, as amended, including, without limitation:

E.     Failing to protect any consumer's credit rating in accordance with 12 U.S.C. 2605 (e)(3); Fairbanks violated this provision when they failed to report my credit account status as disputed.  They made it appear that I was a consumer with a defaulted loan on their credit report.

Section X.

IT IS FURTHER ORDERED that Defendants, and each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby permanently restrained and enjoined, in connection with the servicing of any loan from:

C.     Failing to complete an investigation of any consumer's dispute within sixty (60) calendar days after receiving it, unless through the use of reasonable procedures Defendants are unable to resolve the dispute in that time period, in which event Defendants may take an additional thirty (30) calendar days to resolve the dispute if they so notify the consumer in writing.  Fairbanks violated this provision of the Settlement Agreement.

In May 2004, (See Exhibit), I filed a complaint with the FTC Reference # 4449931.  On June 3, 2004, (See Exhibit 51 ), I received a response from Fairbanks .  They informed me that their records indicated that the servicing of my account transferred to Fairbanks on October 1, 2002 from Fremont Investment and Loan, the assignment was recorded on May 2003, with Fairbanks Capital Corporation, as the attorney-in-fact.  That Fairbanks does not originate mortgage loans and therefore, did not set the terms or have any knowledge of the circumstances surrounding the origination of the loan.  They also stated that because Fairbanks did not originate loans, they could not respond to any allegations made regarding origination.  The local counsel received a copy of this letter also.  If Fairbanks sent them a copy of this letter, wouldn't Fairbanks have sent the local counsel a copy of the Settlement Agreements? Where was the "good faith", and "due diligence" of Fairbanks at this time?  Why did Fairbanks appear to be ignorant of the fact that I had rescinded my loan under the TILA.

Fairbanks also informed me that they had referred my account to their foreclosure attorney on May 8, 2003.  That they had placed the foreclosure action on hold as they addressed my concerns, and that unless a repayment plan is executed within 30 calendar days from the date of this letter, they would resume foreclosure action.  Fairbanks was

willing to consider a forbearance agreement or other arrangements that may give me time to address the overdue amounts. When I contacted Davor J. Malencia at the Loan resolution Department, (866) 878-5178 ext. 27724, I was told that my loan was in a dispute status and that they were working with my attorney however the only 1 person the letter was cc: to was Allison Brown at the FTC, there was no cc: to Mr. Joe Huey, the attorney who was representing me, never received a copy. This was approximately two weeks after the Final Approval date in May. Again at this time I was not "noticed" about the Settlement Agreement or informed of the Default Resolution Program or the Operation Practice Changes or any of the other loan workout options. Fairbanks, at this time, failed to imply or seem to be aware that I they had also demanded and withdrew from arbitration in March and February2004 and that there was a trustee sale scheduled. This is not a proper investigation of a consumer's complaint/dispute.

On June 4, 2004, there was an email from Fairbanks' counsel, (See Exhibit 51) regarding the possibility of staying the trustee's sale in order to allow for settlement discussions. My attorney, Joe Huey responded to the email on June 6, 2004, requesting a 60 day stay of the trustee's sale to allow the parties, including the mortgage broker to reach a settlement of my claims. He also informed Fairbanks that since they were the assignee on the loan, that they were liable for the claims also. He also informed them of the willingness of the brokers' own agent, (Mavis Jones) to testify regarding the broker fee of $27,155.00 dollars and other closing fees that were not disclosed to me. If Fairbanks chose to continue the sale, we would file for a TRO or petition for bankruptcy to develop a plan of reorganization after litigating my claims. The dispute was not resolved within 60 days as ordered. Fairbanks did not investigate my dispute or attempt to resolve it.

E.   Taking any legal or other action to collect the disputed amount and any related charges until the dispute has been investigated and the consumer has been informed of the results of the investigation. Fairbanks violated this provision of the Settlement Agreement when they wrongfully foreclosed   on my home in September 2004.

Section XII.

IT IS FURTHER ORDERED that Defendants, and each of them, their officers, employees, agents, representatives, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, directly or through any corporation, subsidiary, division, or other device, are hereby permanently restrained and enjoined, in connection with the servicing of any loan, from taking any action toward foreclosure until the Defendants have: a) reviewed ant records pertaining to the consumer's loan to verify that the consumer has failed to make three full monthly payments; b) confirmed that the consumer has not

been subject to any of the acts or practices prohibited by this Order, the loan instruments, or law, or if such acts or practices have occurred, that defendants remedied them; and c) investigated any disputes by the consumer and informed the consumer of the results of the investigation. Defendants shall maintain records sufficient to document the steps they take to investigate and conclude each dispute. Fairbanks violated this provision of the Settlement Agreement, when they wrongfully foreclosed on my home in September 2004. The provisions and benefits of the Default Resolution Program and the Operational Practices Changes were never implemented to avoid the foreclosure of my home. The Preliminary Approval Order restrained them from proceeding with the foreclosure and the trustee's sale.

17.

II.    Settlement Procedures

B.    Administration.
    1.    Within twenty (20) business days after the Preliminary Approval Date, Fairbanks was to create a list of Class members. In preparing the Class Member List, Fairbanks was to use information obtainable from its readily searchable computer media and shall update all addresses by use of the National Change of Address ("NCOA") data base (See Exhibit 34 pg. 18). Fairbanks shall have no further obligation to locate Class Members or Settlement Class Members. Co-Lead Counsel will have access to the Class Member List after it is created, solely for purposes of ensuring that the List is correct and this paragraph was complied with by Fairbanks.
    2.    The Settlement Administrator shall cause the Summary Notice to be published in the national edition of the USA Today twice during the four weeks following initial mailing of the Notice. The two publications will be separated by at least seven days.

I was never properly "Noticed" by Fairbanks of the Settlements. I did not receive any Class Action Notice, any Opt out information or any of the required Claim Forms; Late Fees/Default Related Fees, "Prepayment Penalty" and "Foreclosure," needed to participate in the Redress Fund. Since Fairbanks was going through major efforts to publicize the Settlement Agreements, why didn't the Law Firm of Gallagher and Kennedy, their local counsel, who had represented Fairbanks as early as December 2002, inform me of the Settlement Agreement. The Preliminary Approval Order was in effect by December 2003. I had been in active concert/ communication with Fairbanks since December 2002. I was a Class Member, my loan had been serviced by Fairbanks during the class period.. Fairbanks was not using "due diligence" or "good faith" in providing me with the information regarding the Settlement Agreement, their local counsel concealed the

Settlement Agreements . They used "unclean hands".  Their failure to "Notice" me with the Class notices and claim forms denied me of the opportunity to participate in the Redress Fund.  Claim forms were to be mailed to class members at the end of February, 2004.  Fairbanks withdrew they demand for arbitration in early March 2004, and began foreclosure proceedings on March 5, 2004.  If I had been properly noticed of the Settlement Agreements I would have been able to use the failure by Fairbanks to comply with the Settlement Agreement as a defense to the pending foreclosure.  The timing of the Claim Forms being sent and the withdrawl from arbitration and the proceeding with the foreclosure is suspect at best.  Under the Preliminary Approval Order, I could not compel Fairbanks to arbitration because it was a "Released Claim" and the only action that would be available to me was the enforcement of the Settlement Agreement as a "Reserved Claim and Defenses".  Was the failure to "Notice" me or inform me of the Settlement Agreements by Fairbanks' local counsel a result of gross negligence or willful misconduct?

4.       Any Class member that wishes may elect not to participate in the Settlement, except for those aspects of the Settlement that concern or contain standards of conduct or action by Fairbanks with respect to Servicing and related relief. Any such person must personally complete an individual, written and signed notice of intention to opt out of the Settlement and mail it to the address of the Settlement Administrator as printed in the Notice or Summary Notice.  The notice of intention to opt out shall be postmarked on or before the date specified in the Notice or the Summary Notice, which shall be no earlier than 45 days after the initial mailing of the Notices and no later than 20 days before the Final Approval Hearing.  Any Class Member who does not submit a timely notice of intent to opt out, and otherwise comply with all requirements for opting out as may be contained in this Agreement, in the Notice or Summary Notice, and otherwise as ordered by the Court, shall be bound by this Agreement, this settlement and the Release.

III.    Settlement Relief

1.     In consideration of the Settlement and provision of the Releases, the Settlement Class Members shall be provided by Fairbanks with benefits set forth in this Agreement by Fairbanks.  Fairbanks shall be required to provide benefits under this Settlement and this Agreement only after the Effective Date, unless otherwise required by the FTC Order.

2.     Those persons in the Class who are within the scope of the FTC Order shall accept as consideration for the Release given hereby the right to share equitably, as determined by FTC, in the distribution of the Redress Fund established pursuant to

this Agreement and the FTC Order together with relief available to such persons, if any, under other provisions of this Agreement. Settlement Class Members will be deemed to have opted-in to the FTC Agreement as set forth in the FTC Order in United States of America v. Fairbanks Capital Corp., et al., Case No. 03-12219-DPW.

3.   In addition to the benefits under the Redress Fund, Fairbanks will provide additional benefits to the Settlement Class Members. One such benefit is that no later than thirty (30) days after the Effective Date, Fairbanks shall undertake a "Reverse or Reimburse Program". For the purposes of this provision, "reverse or reimburse" means cancellation of improperly or unnecessarily assessed charges on open accounts of the Settlement Class Members together with refund of improperly or unnecessarily paid charges on the accounts of the Settlement Class Members, whether open or closed. Such charges include money recovered by Fairbanks following a completed foreclosure. For purposes of this provision, "open accounts" includes any account on which Fairbanks continues to provide Servicing as of the Effective Date. For purposes of this provision, "reimburse" means repayment in cash whether the account is open or closed. The scope of the program included only fees and charges listed in items a-e below. ( See Exhibit 34 pg. 27).

4.   Within thirty (30) days after the Effective Date, (See Exhibit 34 pg. 30 ) Fairbanks also will  implement the "Default Resolution Program," attached hereto as Appendix 1, for all loans serviced by Fairbanks. The program shall remain in effect for a minimum of five (5) years. Fairbanks violated this provision of the Settlement Agreement, by failing to inform me that this was an alternative to foreclosure.

5.   Within sixty (60) days after the Effective Date, Fairbanks will implement the "Operational Practices," attached hereto as Appendix 2, for all loans serviced by Fairbanks. The Operational Practices shall remain in effect for a minimum of five (5) years. Fairbanks violated this provision of the Settlement Agreement, by failing to inform me that this was an alternative to foreclosure.

c.   In agreeing to implement the Default Resolution Program and the Operational Practices, Fairbanks does not admit that any of the contents thereof, or the policies, procedures and practices they or the Reverse or Reimbursement Program reflect, are required by law or contract. Plaintiffs, Class Counsel, and the Class do not, by this Agreement, admit that any of the contents of the Program or the Practices are permitted by law or contract. No claim to enforce either the Default Resolution Program or the Operational Practices shall be brought other than in the Court in a proceeding to enforce this Agreement, and customers of Fairbanks, or anyone else, may not sue or claim for damages or other personal relief based on the terms of the Default Resolution Program or the Operational Practices, provided however that an action, claim or defense based upon the Default Resolution Program or the Operational Practices may be raised as a defense to an individual foreclosure (and will be treated like a Reserved Claim and Defense is treated

under this Agreement).

18.

## IV.   Releases

2.   Plaintiffs and Settlement Class Members hereby covenant not to sue Fairbanks and/or the Fairbanks-Related Parties regarding any of the Released Claims except for the right to assert the Reserved Claims and Defenses.  Plaintiffs and Settlement Class Members hereby further   covenant not to sue Fairbanks and/or the Fairbanks-Related Parties other than as an individual (rather than as a member of a class or putative class or as a beneficiary of a representative action of any sort)regarding any of the Reserved Claims or Defenses.  To support this covenant, Plaintiffs and each Settlement Class Member hereby disclaim, waive, release and forever forbear any rights any of them may have to participate in or benefit from any class or representative action commenced or prosecuted with respect to the Reserved Claims and Defenses.

## V.   Representations and Warranties

7.   Any dispute concerning the truth or effectiveness of these representation and warranties, or the effect of any breach, shall be brought only in the Court, and the Parties, including the Settlement Class Members, consent to the Court as having exclusive jurisdiction to entertain such proceedings.

## VIII.   Additional Terms

1.   The obligation of Fairbanks, including those contained in the Agreement, in the Default Resolution Program, and in the Operational Practices, shall be performed reasonably and in good faith.  So long as it abides by the terms of the Settlement and performs reasonably and in good faith in carrying out the Agreement, the Default Resolution Program , and Operational  Practices, Fairbanks shall not be liable for erroneous, improper or inaccurate actions, omissions, crediting or payment, or breach of the Agreement, the Default Resolution Program or the Operational Practices, and the releases and any judgment shall be effective as of Final Approval as to every Plaintiff and Settlement Class Member notwithstanding any error or dispute and regardless of whether such error or dispute and regardless of whether such error or dispute is corrected or addressed only thereafter, unless such act or omission is a result of gross negligence or willful misconduct. In the event a dispute arises concerning Fairbanks' performance of its obligations under the Agreement, Fairbanks shall have the right to cure (or commence cure within 30 days of notice of the dispute)as to such act or omission that gave rise to the

dispute , in which event Fairbanks shall have no liability for breach of the Agreement.

2.    This Agreement is intended to and shall be governed as if a contract executed under the laws of the Commonwealth of Massachusetts.

8.    This Agreement, and the Settlement, shall not affect the commencement or continued prosecution of any judicial or nonjudicial foreclosure, or otherwise limit or restrict in any way the rights of Fairbanks or the Fairbanks-Related Parties to pursue default and foreclosure remedies (other than as such rights may be affected by the terms of the default Resolution Program or Operational Practice  changes).

9.    Although the Court shall enter a final judgment, the Court shall retain jurisdiction over the interpretation, effectuation, enforcement, administration, and implementation of this Agreement and of any question, issue, proceeding or action regarding the effect the Agreement and the Settlement shall have.  If the Court determines it does not have such jurisdiction, or it does not exercise its jurisdiction, the exclusive jurisdiction and venue for such action shall be a court in the jurisdiction where Fairbanks has its principle place of business.

11.    This Agreement shall not be offered or be admissible in evidence by or against Fairbanks or the Fairbanks-Related Parties or cited or referred to in any other action or proceeding, except one(1) brought by or against the Parties to enforce or otherwise implement the terms of this Agreement, (2) involving any Plaintiff or Settlement Class Member  to support a defense of res judicata, collateral estoppel, release, or other theory of claim preclusion, issue preclusion, or similar defense, or (3) involving an attempt  to enforce the Suit Injunction or otherwise to stay limit other litigation inconsistent with the terms set forth in this Agreement and the Court's Order preliminarily approving this Agreement.


19.

Appendix 1- Default Resolution Program  (See Exhibit 35 ).

 Fairbanks Capital Corp. ("Fairbanks") will implement the following Default Resolution Program ("DRP") described in Section III.6 of the Settlement Agreement and Release, executed to resolve Curry v. Fairbanks Capital Corp., No. 03-CV-10895-DPW., and the Violations by Fairbanks.

I.    Program Notice

A.    Fairbanks will provide a letter to delinquent borrowers by first class mail at 45 days of delinquency.  The letter will contain the following information, except where

inconsistent with legal or investor requirements:

1. A statement of the amount of the borrower's deficiency as of the date of the letter, with a breakdown of the amount to reinstate by delinquent payments, advances, escrow advances and fees. I never received this statement.

2. A statement that Fairbanks assists borrowers to resolve delinquencies and avoid foreclosures, at no cost to the borrower. Fairbanks will provide the toll free number for its Primary Collection Department and a toll free contact number for its Loan Resolution Program. The only contact that I ever had from the Loan Resolution Department was their letter on June 3, 2004. I never heard from the Loan Resolution Program again. There was no interest on the part of Fairbanks to resolve the disputed right of rescission claim, or resolve the delinquency in a fair and equitable manner. It was either Fairbanks' way or the highway.

3. A statement that Fairbanks is willing to review disputes about a delinquency; and a statement that Fairbanks will assist borrowers to avoid foreclosure by implementing a workout plan if the borrower meets applicable criteria. Fairbanks never reviewed my dispute about my delinquency. I had problems with this loan with the first month. I had contact with the Salt Lake City branch in December 2002, and they offered an unfavorable forbearance agreement, that would have had me release all claims against Fairbanks forever, including my right of rescission claim and other TILA violation claims. Fairbanks allowed me to miss 6 months of payments before they started the first foreclosure action. I rescinded my loan in July 2003, and they didn't respond until October 2003, another violation of the TILA and RESPA.

B. Fairbanks will undertake certain efforts to publicize its loan resolution programs, including:

2. a one-time mailing of information about these programs to housing and consumer counseling organizations, to be selected by Co-Lead Counsel;

3. a one-time mailing of information about its loan resolution programs, staged over a six-month made to all borrowers who are delinquent two payments. The statement shall state: "We have options and programs to help you resolve your delinquency. Please call our Loan Resolution Department at our toll free number", and,. Fairbanks, never directly or indirectly or through their local counsel informed me of any of the loan resolution programs. It was strictly litigation not resolution.

II.     Addressing Disputed Delinquencies

A. Fairbanks will provide a written response to a borrower dispute about a

delinquency ("response letter") as required by law and as specified in the FTC Order, and will comply with applicable RESPA guidelines.  Foreclosure was the only response from Fairbanks when it came to any of my inquires  regarding dispute resolution.

C.  Fairbanks will halt assessment of late fees, demand fees, and foreclosure related charges, and halt any legal or other action to collect the disputed amount and any related charges, pending resolution of a borrower's dispute concerning the delinquency, so long as that dispute will have a material effect on whether foreclosure is warranted, but the borrower's other payment obligations remain fully due and owing during the pendency of Fairbanks' investigation of the disputed item.  Fairbanks will report the consumer as delinquent based on the disputed amount, pending resolution of the dispute.

Fairbanks may inform borrowers that they should pay the undisputed amount while the disputed amount is being investigated and payments received will be posted and credited to the undisputed amount.  Fairbanks may assess fees and charges if a borrower enters into a verbal repayment agreement while Fairbanks is investing a dispute or after it responds to a dispute, but will Reverse or Reimburse the consumer for such fees and charges if the dispute is resolved in the borrower's favor.  Fairbanks never provided me due process when it came to the resolution on whether or not my right of rescission claim was valid. Under the TILA once a consumer rescinds their loan they are not liable for any other charges.  Due to Fairbanks' failure to participate in dispute resolution or comply with the Settlement Agreement, led to an increase in extra fees and late charges.

20.

III.     Loan Resolution Programs

A.  Fairbanks will use reasonable and diligent efforts to offer eligible borrowers a loan resolution program within the dictated and limits of investor requirement and restrictions, servicing agreements, and insurer guidelines.  Fairbanks will expressly instruct, train and monitor its employees to do so.  Fairbanks the company or through they counsel, never offered any type of loan resolution.

C.  The following provisions will apply to all loan workout programs:

1.  Fairbanks will not refer any loan to foreclosure until the 92nd day after delinquency; until it verifies that the consumer has failed to make three full monthly payments; and until it otherwise complies with the procedures set forth in the FTC Order as prerequisites to referral to foreclosure.  Fairbanks referred my loan in March 2004, after withdrawing from the arbitration that they demanded and were required to do under the loan agreement, to foreclosure.  The Preliminary Approval Order, was in effect at this time in March and Fairbanks was hereby permanently restrained and enjoined, in connection

with the servicing of any loan from taking any action towards foreclosure. Fairbanks proceeded with the wrongful foreclosure of my home in September 2004. ▯

IV.     Miscellaneous

4. Operational Practice Agreements, made pursuant to Paragraph III (6) of the Stipulation (Appendix 2) will also be implemented and may affect foreclosure or other default resolution to the extent of any inconsistency, the practices obtained in this document will control.

Fairbanks Capital Corp. Operational Practices Agreement in Connection with the Settlement of Curry et al. v. Fairbanks Capital Corporation

Appendix 2- Operational Practices Agreement ( See Exhibit 36)

Fairbanks Capital Corp. ("Fairbanks") will implement the following Operational Practice described in Section III.7 of the Settlement Agreement and Release, executed to resolve Curry v. Fairbanks Capital Corp., No. 03-CV-10895-DPW

21.  1.  Loan Servicing Acquisition/Servicing Release

1.3    For delinquent loans, validation of debt letters will be sent to the borrowers within 5 days of the hello letters. These letters will provide information regarding amount due (including a specific breakdown of any amounts other than principal and interest) and allow the borrowers to validate that the information with which Fairbanks has been provided matches their records. The borrower then has the opportunity to dispute the amounts claimed owed. Contact information will also be provided in the letter. I never was provided with a validation of debt letter by Fairbanks. I was never given the forum to dispute the amounts claimed owed.

3.  Primary Collections (1-90 Days Delinquency – Prior to Foreclosure Referral)

3.6    Collectors will focus not only on the payments due, but also the borrower's reason for default. Collectors will utilize active listening skills to determine why the borrower fell past due and will be trained to ask follow-up questions, and clarify the details of the borrower's situation. The collector will refer borrowers to Delinquency Resolution Program ("DRP") resolutions when such programs will address a borrower's circumstances. I was never given the opportunity to speak with anyone in the Collections

Department. When I contacted Fairbanks in June 2004, in response to their letter, they informed me that my loan was in Dispute status and they were working with my attorney. Even if I had an attorney I still should have had the opportunity to decide if any of the available loan workout options could be of benefit to me.

## 5. Consumer Assurance Review Division

5.1     The purpose of the Consumer Assurance Review Division (CARD) will be to ensure the timely and efficient resolution of disputes, potential servicing exceptions or origination issues to protect the borrowers or Fairbanks from loss and identity issues on behalf of the holder of the loan.

5.2     At the 63rd day of delinquency accounts will be referred to CARD. I was never referred to CARD.

5.3     CARD will review the account and contact history to determine if there are no unresolved disputes. I was never referred to CARD.

5.4     Additionally, specific servicing areas will be reviewed to assure there are no outstanding servicing problems. These areas will include unresolved disputes related to:

5.4.8     Prior Servicer Issues. Fairbanks failed to honor my right of rescission claim

5.4.9     Written/Verbal Dispute. Fairbanks failed to resolve the dispute regarding the validity of my right of rescission claim and failed to arbitrate my dispute as provided in the loan agreement.

5.5     Upon completion of all elements above, if any unresolved servicing problems are found, the CARD specialists will then notate the account and forward the account to the appropriate Fairbanks personnel for resolution. Action taken to resolve the servicing problem will be noted in the contact history.

## 11. Miscellaneous Operational Practices

11.1     When a written dispute is received from the borrower, regulatory agency or borrower's specifically-authorized representative (including counseling organizations and advocacy groups), the status of the account will be charged to DISP (Dispute.) This status stops all collection and foreclosure activity until the dispute is resolved (and notice of resolution is sent to the borrower, if such notice is otherwise required under the FTC Order, the Default Resolution Program, or law) and the status of the account is changed

1  back to the previous or correct status.

2  11.4      Fairbanks will also implement any agreements with the Federal Trade
   Commission that concern procedures to be followed and records to be kept in connection
3  with the Fairbanks' operational practices.

4

5  22.            Factual background for my wrongful foreclosure complaint

6

7      Why am I filing this complaint for wrongful foreclosure?  How did I lose my home to
   foreclosure?  Why were there never any other options made available to me by the Lender
8  or the Servicer when my loan was delinquent?  Does the Consumer really have any rights
   to protect them from Predatory Lending and Mortgage Servicing Fraud?  The American
9  Dream is now the American Nightmare.

10

11     In March 2002, I was approached by a friend to refinance.  Mavis Jones was a Loan
12 Officer at American Residential Funding, Inc., the Bkbr number on the business card I was
   given was #0103727.  She explained to me that I could consolidate my debts at a good
13 interest rate.  I filled out the application and was approved. However I was never provided
   with the appropriate predisclosure documents required at the time the loan application had
14 been submitted.  I never received: ( 1) An Appraisal Notice, (2) Truth in Lending
   Disclosure 3) Good Faith Estimate, ( 4) Servicing Transfer Disclosure Statement, (5) ARM
15 Program Disclsosure, and  (6) A Consumer Handbook on Adjustable Rate Mortgages
   which is a requirement under Reg. Z.   These disclosures are required by law to be
16 provided to the consumer/borrower.

17

18     On March 25, 2002, I spoke with Mavis and she informed that the closing would take
19 place later that day.  I asked her if American Residential Funding, Inc. had provided my
   financial advisor, Michael Sherman,  at Peacock, Hislop, Staley and Givens, with the loan
20 documents for his review.  I was only going to sign off on the loan if Mr. Sherman thought
   that this was an affordable loan for me.  Mavis Jones informed me that her loan supervisor
21 C.J. Jackson/Ben Jackson , had spoken with Mr. Sherman earlier and that he would fax the
   loan documents over to him that day before the closing that was to place later that that day.

22
       When I spoke with Mr. Jackson, he told me that he was taking care of everything.  He
23 assured me that I was getting a good loan with a fixed interest rate like the one I had with
   Countrywide.  He told me that the broker fee was only going to be $5000.00 dollars ,that all

24

1   my creditors would be paid off and that my property taxes would be brought current and
    that one of my vehicles would also be paid off.  He fraudulently induced me into this loan
2   and fraudulently concealed the true cost of the loan and the broker fee.  Mr. Jackson told
    me that he would be accompanying Mavis to the closing to make sure that everything
3   would go smoothly since this was her first loan.

4      Ms. Jones and Mr. Jackson arrived right at the dinner hour, around 6:00 pm.  There
    were numerous documents to be signed.  I was directed by Mr. Jackson, as to where to
5   sign. While signing the documents I noticed that there were numerous inconsistencies as to
    when the documents were dated. Mr. Jackson told me that these documents reflected the
6   estimates and final costs . Mr. Jackson told me that if I didn't sign the documents that I
7   would lose my locked in rate.  I relied on Mr. Jackson and American Residential Funding,
    Inc., and it was a detriment to me.  This is consistent with misrepresentations of the terms
8   of the loan agreement.

9      When it came to the Notice of Right to Cancel (NORTC) it was incomplete and not
    accurate, it contained blanks. The space for the date where the date for when the rescission
10  period was to begin was blank.  I told them that I would sign the NORTC, but not date the
    NORTC because they were not able to provide me with a complete copy of the loan
11  documents that I was signing. ( I needed a copy of the loan documents to review so that I
    could I could discuss the dollar amount of the loan with Mr. Sherman the next day).  Mr.
12  Jackson told me that the three (3) day rescission period would not begin until I received a
    copy of the documents and that I would receive the documents before the loan closed on
13  March 29, 2002.

14     So I signed the document that contained blanks which is a violation of A.R.S. $41-
15  311(5).  This was an incomplete document.  An incomplete document is a document where
    obvious blanks appear in the document. The notary cannot perform a notarial act on a
16  document that contains fields that should be filled in.

17     I was not provided with the required the two (2) completed copies of the NORTC,
    which is required under  15 U.S.C. 1635 (a), Reg. Z 226.5(b) 226.23(b).  This is a TILA
18  violation.  The failure by the lender to provide two (2) completed copies of the NORTC to
    the borrower, gives rise to an extended three (3) right of rescission.  I was also not provide
19  with a copy of all the material TILA disclosures

20     The failure of the lender to provide a complete and accurate NORTC is a violation of
    TILA.  The dates on the NORTC are to be filled in by the Lender.  The NORTC is to be
21  clear, complete and accurate. The lender is required to fill in the form and dates(not the
    borrower)See 15 U.S.C. 1635 (h) which states: "An obligor shall have no rescission rights
22  arising solely from the form of written notice used by the creditor to inform the obligor of
    the rights of the obligor under this section, if the creditor provided the obligor the
23  appropriate form of written notice published and adopted by the Board, or a comparable

24

written notice of the rights of the obligor, that was properly completed by the creditor, and otherwise complied with all other requirements of this section regarding notice." This seems clear (and therefore controlling), the lender has the obligation to complete these forms.

"Under both TILA and Regulation Z, the test for disclosure of the rescission right is whether the form of notice that the lender provided constitutes a clear notice of that right. See Porter v. Mid-Penn Consumer Discount Co., 961 F.2d 1066, 1076 (3d Cir. 1992) ("the law does not require an ideal notice of rescission rights, just a clear, accurate and conspicuous one."), the right to rescind can be clearly disclosed only if those two dates are filled in. See Meyer v. Argent Mortgage Co., (in re Meyer), 379 B.R. 529 (Bankr. E.D. Pa. 2007).

The failure of the lender to provide the borrower with a copy of all the material disclosures is a violation of TILA and provides for an extended three (3) year right to rescind the loan. See 15 U.S.C. 1635 (a); Reg. Z 226.15(b)  226.23(b).

Some Courts have held that a mortgage broker is a fiduciary. One who finds and arranges financing for another becomes the latter's agent for that purpose, and owes statutory, contractual, and fiduciary duties to act in the interest of the principal and make full disclosure of all material facts. "A person who undertakes to manage some affair for another, on the authority and the account of the latter, is an Courts have described a mortgage loan broker as an agent hired by the borrower to obtain a loan.  As such, a mortgage broker owes a fiduciary duty of the "highest good faith toward the borrower." It is also the mortgage broker's duty to contact a number of lenders and attempt to obtain the best possible terms for the borrower.  Additionally, the mortgage broker has the duty to disclose all the material facts concerning the transaction that might affect the borrower's decision on whether or not to accept the loan.  The duty to disclose extends to the fee/compensation that the mortgage broker is receiving.  When the mortgage broker accepts employment as an agent, they pledge to protect the interest of the borrower.

The payment of compensation by a lender to a mortgage broker without full disclosure can result in liability under the federal mail and wire fraud statutes and RICO.  It was never disclosed to me that the mortgage broker, American Residential Funding, Inc., was going to receive  27,155.00 from this loan and that in order to achieve this they added 8,558.55 to the total wire amount.  I was approved for 500,000.00 and I did not agree to the additional amount of money being added to my loan.  The fees associated with this loan were a violation of section 8 of RESPA , if the payments are either not fully disclosed or exceeded reasonable compensation for the services actually performed by the originator.


On March 26, 2002, I phoned American Residential Funding regarding my loan documents.  Mavis told me that I had to speak to C.J. Jackson, because he was her

1   supervisor. I asked him for a copy of my loan documents and he told me that he would get
    them to me ASAP. I never received the documents before the  closing date of March 29.
2   American Residential Funding breached their fiduciary duty by lying to me. When I spoke
    with Mavis Jones on March 29, 2002, she told me that the loan had closed and funded. I
3   asked how the loan could close and be funded, without me not being provided my required
    disclosures and a notary being present. She told me that she thought that C.J. Jackson had
4   delivered the disclosures to me. I asked her how the loan could be funded when there was
    no notary present and that I never signed a notary journal, which is required by law. A
5   journal provides  proof that a notary took the reasonable steps necessary to identify the
    signer of a document . A notary shall have a journal. Failure to comply, not maintaining a
6   journal is in violation of A.R.S. $41-319.  She informed me that Mr. C.J. Jackson; a/k/a/
7   Ben Jackson, the loan officer, was the notary Ernest B. Jackson. So that I  didn't need to
    sign the notary journal and that there was a notary present; the loan officer C.J. Jackson.
8   This is notarial misconduct.

9

10  23.   An Arizona Notary Public is a public officer commissioned by the Secretary of State
    to perform notarial acts. See a copy of the Arizona State Notary Public Manual.  A notary
11  is an impartial witness (A.R.S. $41-328(B).  An impartial witness must have no conflict of
    interest. This means a notary cannot be a "party to the transaction" or "a party to the
12  instrument " and the notary public cannot have any financial or beneficial interest in the
13  transaction, no matter how small (A.R.S. $41-328(B).  A notary public has a financial
    interest in a transaction if he or she will gain (or lose) something of value in the
14  transaction. Mr. Jackson was the loan supervisor for a loan that contained a broker fee of
    27, 155. ( See  Exhibit 2), he had an interest in this loan.  A notary public has beneficial
15  interest in a transaction if the document will benefit the notary in some way.  When C.J.
    /Ben Jackson, was present at my home during the closing, he represented himself as a loan
16  supervisor, from American Residential Funding, Inc., not an Arizona commissioned notary
    public,  He was no longer an impartial witness and should not have performed the
17  notarization.

18      An instrument is the document on which a notary public is notarizing a signature.  A
19  party to the instrument is someone who is mentioned in the document either by name or
    job title or classification or who would have some kind of beneficial or financial interest in
20  the document.  If a notary public is a party to the instrument, then he or she has an interest
    in the transaction and are no longer an impartial witness; and therefore should not notarize
21  a signature.  A part to the transaction has the same meaning as party to the instrument.  A
    notary public who engages in any fraudulent or deceptive conduct related in any way to
22  one's capacity as a notary may be liable for misconduct.

23      Mr. Jackson violated A.R.S. $41-330 by failing to discharge fully and faithfully any of
    the duties or responsibilities required of a notary public. There were no certificates of
24

acknowledgements that verified the signatures that were on some of the pre-signed documents.

Notarial Language was missing. A notary public who does not place notarial language on a document has performed an incomplete notarization. A court of law could declare the notarization invalid. When I signed the Pre-Audit Settlement Charges Statement (See Exhibit 3) it had been pre-signed by Janice M. Conley , from Security Title Agency and there was no certificate of acknowledgement that the person who signed them actually signed them. There was nothing that indicated that there was a certificate of acknowledgement associated with these documents documents presented to me at the closing that took place at my house. I never met with either the escrow agent or the closing agent. They were not present at the closing

Acknowledgements under A.R.S. 441-311(1) state that even if a document has been pre-signed, the document signer must be in the notary's presence at the time the notary performs the notarization, because the notary is attesting to the genuineness of the signature, the notary may not perform an acknowledgement that will be signed at a later time. Mr. Jackson violated this statute.

24. The Dispute Resolution Agreement was signed by me on March 25, 2002 and the lender/funder Susan Poovichit signed the document on March 29, 2002. The loan was acknowledged and executed by Ernest B. Jackson on March 25, 2002, before the Dispute Resolution Agreement was even signed by the funder. (See Exhibit 1), Mr. Jackson, violated A.R.S. $41-311(5) by notarizing incomplete documents. This just goes to show that I never received a copy of any of the loan documents. The Dispute Resolution Agreement was included in with all of the other documents. There was no way I could have had a copy of any the loan documents, if the lender did not sign the Dispute Resolution Agreement until March 29, 2002, which was after the rescission period expired. If I had been provided with the proper NOTRC and rescinded the loan, the Dispute Resolution Agreement would not have been signed until March 29, 2002

Another example of Mr. Jackson notarizing incomplete documents is the Payoff Demand Statement from Countrywide Home Loans (See Exhibit 4). "The Borrower's Payoff and Close- Out Authorization Is Required In Order To Close The Borrower's Line Of Credit. Please fax the Escrower's Payoff and Close-out Authorization to 1-805-577-3466 prior to remitting payoff funds. If payoff funds are remitted without this authorization form, the payoff funds will be posted to the borrower's account, but the line of credit will NOT be closed and Countrywide's mortgage or deed of trust will Not be released." Payoff Authorization: I wish to payoff and CLOSE my Home Equity Line of Credit, as specified above. I understand that after my loan is paid off, I will no longer be able to use this line of credit and Countrywide will release the lien and reconvey my

property. The Borrower's Signature (required). The document contains no borrower signature. The borrower's signature line is blank.

If you look at the figures on the Payoff Statement, I have one loan at Countrywide for 131,067.77 at a fixed interest rate of 6.8750. The second loan at Countrywide was 281,291.42 at a fixed interest rate of 7.375. Why would I refinance my loan, to a loan with a higher adjustable rate interest? I would have never agreed to those terms. Unfortunately for me the loan was paid off and recorded on April 5, 2002, without the required signature and notarized in blank.

When you take a look at Exhibit 2, you will see I have two copies of the same documents "Under Lender's Closing Instructions" packets. One is signed and initialed and the other is blank. On page 1 of the Lender's Closing Instructions, it states that "ALL DOCUMENTS MUST BE DATED AND SIGNED BY EACH PERSON EXACTLY AS THEIR NAMES APPEAR. CUSTOMER IS TO BE SIGNED BY CLOSING AGENT-BROKER MAY BE PRESENT." On page 6 of 6, the instructions read "This loan must be closed and disbursed according to these instructions. If you obtain information that is contrary to the information contained herein, do NOT proceed with closing until you have contacted your Funder for authorization of changes, (why didn't the failure to provide a signature on the Countrywide Payoff Statement constitute a change)? Do Not disburse any funds until you have complied with all of the requirement contained in these instructions." I supposedly signed this page on March 25, 2002. There is no signature provided by the closing agent. Again another document notarized in blank.

A.R.S. $ 33-503 regarding the Certificate of person taking acknowledgement. The person taking an acknowledgement shall certify that: the person acknowledging appeared before him and acknowledged he executed the instrument. My name does not appear on the page, making it an incomplete document that was notarized.

A.R.S. $ 33-505 regarding the Certificate of Acknowledgement the words "acknowledged before me" means that the person acknowledging appeared before the person taking the acknowledge. However in this particular instance the loan was not properly executed because the certificate of acknowledgement fails to recite who appeared before the notary public (See Exhibit 6 Deed of Trust). On the Deed of Trust on page 15 of 15, where "the foregoing instrument was acknowledged before me this ( date/March 25, 2002) by (name of person acknowledged.)my name is absent. Recent case law, including a 2008 decision from the Sixth Circuit BAP, supports the position that an acknowledgement is defective if it fails to identify the person whose signature is being acknowledged. See In re Nolan, 383 B.R. 391, 396 (6th Cir. B.A.P. 2008); In re Sauer, 417 B.R. 523,(Bankr. S.D. Ohio 2009);

Arizona Revised Statutes : Title 38. Public Officers and Employees Chapter 3. Conduct of Office Article 3. Records $38-423. Making or giving false certificate: classification. A

public officer authorized by law to make or give any certificate or other writing, who makes and delivers as true such a certificate or writing containing a statement which he knows is false, is guilty of a class 6 felony.  Mr. Jackson violated this statute.

Arizona Revised Statutes: Title 39. Public Records, Printing and Notices Chapter 1. Public Record Article 4. False Instruments and Records $39-161. Presentation of false instrument for filing: classification.  A person who acknowledges, certifies, notarizes' procures or offers to be filed, registered or recorded in a public office in this state an instrument he knows to be false or forged, which, if genuine, could be filed, registered or recorded under any law of this state or the United States, or in compliance with established procedure is guilty of a class 6 felony.  As used in this section "instrument" included a written instrument as defined in section 13-2001.  Mr. Ernest B. Jackson broke the law. This transaction should have been voided for notarial misconduct and the improper execution of the mortgage.

25.   There were numerous problems associated with this loan. See Exhibit 1.  The DOC Request checklist for first mortgages signed on March 25, 2002 indicates that the total fees charged were to be 18,832.00 and the Maximum APR allowed was 15.37 and the APR on the loan was 9.745.  The gross amount of the loan was 500,00.00 and the net amount of the loan after the fees was 481,168.00.. According to the loan application that I signed, the APR was 9.45.  The Fremont Investment & Loan Commitment document dated on March 22, 2002 states that the starting rate was 8.990 with the ceiling 0f 15.990  The APR on the Federal Truth in Lending Disclosure Statement Predisclosure dated March 22, 2002,(that I never received) was 9.482 with the amount financed 491,903.35.  The Final Federal Truth in Lending Disclosure Statement that I signed on March 25, 2002, indicates the APR at 9.745 and the amount financed was 480, 798.55.  Can these different APR's and amounts financed be considered accurate, clear and conspicuous?  The Wire Authorization Checklist (See Exhibit 1) indicated the Prepayment Penalty Term was 5 years.  I didn't receive a copy of any of these documents until after the loan closed and was funded and I hired James McGuire to represent me.

The Fremont Investment & Loan Funding Figures Statement dated March 29, 2002, states the interest rate at 8.9900 (See Exhibit 1).  The Broker fee of 27,155.00 was undisclosed to and so was the total wire amount of 508,558.55.  If fees increase after the loan documents are drawn, they must be redrawn with the correct amounts. this was never ever disclosed to me. I was mortified.  The amount to pay off one of my vehicles was 27,070 and I paid more than that in a Broker fee?  This is a violation of RESPA, 12 U.S.C.1261 et seq.  No wonder my vehicle was not paid off.  I was never made aware of these amounts prior.  The funder was Susan Poonvichit.  This is the same Susan Poonvichit that signed the Dispute Resolution Agreement on March 29, 2002,

1

2    The Real Estate Settlement Procedures Act(RESPA)12 U.S.C. 1261 et seq. (See Exhibit 3). RESPA is a consumer protection statute passed in 1974. It was enacted in

3    order to (1) help consumers become better shoppers for settlement services and (2) eliminate kickbacks and referral fees that unnecessarily increase the costs of certain

4    settlement services. To accomplish these ends, RESPA requires that borrowers receive disclosures at various times.

5

6    26.  What are Settlement Services?  Settlement services under RESPA are defined as any service provided in connection with a real estate settlement including the preparation

7    of documents, the rending of credit reports or appraisals, services rendered by a real estate agent or broker and the handling of the processing and closing or settlement 12 U.S.C.

8    2602 (3).

9    RESPA Disclosures.  (1) Disclsosure at the time of loan application: Good Faith Estimate of Settlement Costs.  When borrowers apply for a mortgage loan, RESPA

10   requires mortgage brokers and/or lenders to give the borrowers:

11   A. A Good Faith Estimate (GFE) of settlement costs, which lists the charges the buyer is likely to pay at settlement.  This is only an estimate and the actual charges may differ.  I

12   received my GFE on March 25, 2002, the day of the closing.  I never received a final GFE.

13   B. A Mortgage Servicing Disclosure Statement, which discloses to the borrower whether the lender intends to service the loan or transfer it to another lender.  This Statement also

14   provides information about complaint resolution.  I never received this Disclosure

15   Statement.

16   C. Unless the borrower's application is turned down within three days, a lender must mail these documents to the borrowers if they did not receive them at the time of their

17   application.  I never received any of these documents.

18   RESPA's prohibition against "Kickbacks" and Unearned Fees.  RESPA prohibits anyone from giving or accepting a fee , kickback or any "thing of value" in exchange for

19   referrals of settlement service business involving a federally related mortgage loan". 12 U.S.C. 2607 (a).  This provision of RESPA was violated when after American Residential

20   Funding Inc., received the Broker fee of 15, 000.00 they also received a 10,00.00 YSP. Violations of RESPA's anti-kickback, referral fees and unearned fees provisions are

21   subject to criminal and civil penalties.  In a criminal case , a settlement agent who violates Section 2607 may be fined up to 10,000 and imprisoned up to one year.  12 U.S.C.

22   2607(d)(1).  In a private lawsuit any person who violates this Section may be liable to the person charged for the settlement service an amount three times the amount of the charges

23   paid for the service. 12 U.S.C. 2607(d)(2).

24

27.   The Lender's Closing Instructions (See Exhibit 2) indicated that my property taxes were current on March 6, 2002; in reality they were in arrears. See Exhibit 1B. The property taxes for 1997, were still due and this was discussed in an exchange between Security Title Agency agent Cindy Houck and C.J. Jackson from American Residential Funding Inc., on April 4, 2002.  A check was issued from the loan disbursement account (See Exhibit 1) in the amount of 5920.05 to the Maricopa County Treasurer to bring the account current.  This amount for the taxes is consistent with the amount on the Settlement Statement from Security Title Agency that I did not sign and the Escrow Settlement Statement dated March 29, 2002.  The Settlement Statement that I signed on March 25, 2002, indicated that 2349.49 was to be paid to Maricopa County Treasurer.  This Settlement Statement had been pre-signed by Janice Conley from Security Title on March 25, 2002.  On April26, 2002 I received a letter from Janice Conley from Security Title Agency stating that three checks had been returned from creditors because of not good account numbers.  If they didn't receive good account numbers by Friday May 3, 2002, then on May 6, 2002 they were going to forward the checks as drawn to American Residential Funding, Inc. for me and the lender to properly distribute as required.  When I contacted American Residential Funding, Inc. they told me that all of checks had been properly distributed and everything was paid off.  On July 24, 2004 I received a letter from Select Portfolio Servicing (See Exhibit 1). , stating that the property taxes were delinquent in the amount of 4671.28 for the year 2002, and 234.81 for the year 2003.  American Residential Funding Inc., never paid my taxes and where did the money go?

When you look at Exhibit 3, there are two different Escrow Settlement Statements that correspond to the two Settlement  Statements.  On the Escrow Settlement Statement from Security Title Agency (Pre-Audit)( dated March 25, 2002 and Closing Date: March 29, 2002), the amount that was to be paid to the Maricopa County Treasure was 2349.49.  The amount of the Net Proceeds Refund (or refund to the Borrower) was 14,018.06.  The gross amount due from Borrower was 485,981.94.  These amounts correspond to the Settlement Statement that I signed and had been pre-signed by Janice Conley and dated March 25, 2002, with a Settlement date of March 29, 2002.  However on the second Escrow Settlement Statement from Security Title Agency (not signed) (dated March 29, 2002 and Closing Date: March 29, 2002), the amount that was to be paid to the Maricopa County Treasure was 5920.05.  The amount of the Net Proceeds Refund (or refund to the Borrower) was 10, 447.50 or 10.557.50.  The gross amount due from Borrower was 489,442.50(there was a 110.00 difference that was a fee paid to Security Title Agency to pay/write checks to the creditors).  How is it that I never received a check for 14,018.06, but rather 10,447.50(See Exhibit 1, The DIsbursement Summary).The 10, 557.50 refund amount to the Borrower (that I received), reflects the Settlement Statement that I did not sign. This amount also reflects the difference of 3570.56, the amount of taxes due for the

second half.  I did not sign the Settlement Statement that reflects these changes, how could I?  The Escrow Settlement Statement that reflects these amounts was dated March 29, 2002 with the Closing Date: March 29, 2002.  I signed all of the documents on March 25, 2002. If there were going to changes the amounts, that could effect the amount financed then new documents should have been drawn up that reflected these changes.

My loan was closed on March 25, 2002 and funded on March 29, 2002.  However, neither of these two amounts,  reflect the amount financed on the Final Truth In Lending Disclosure Statement (that I signed), that amount was 480,798.55 with an APR of 9.745. Now if you look at the Loan Fee Disbursements Statement (See Exhibit 2) on page 4 of 6, the wire amount is 481,403.55.  The 481,403.55 added to the broker fee of 27, 155,000.00 is equal to the amount of the wire amount of 508,558.55(See Exhibit 1, The Disbursement Summary).  What was the fee of 18,227.00 for?  The amount financed estimated on the Predisclsoure Federal Truth In Lending Disclsosure was 491,903.35 at an APR of 9.482.

All of these various" amounts" financed and other unexplained fees are not indicative of an accurate, clear and conspicuous accounting associated with the required "material disclosures" that informs the borrower of all the costs and fees associated with the cost of a loan.  Is this the reason why I was never provided these "material disclosures" until after the loan funded?  Closing or settlement fees charged to the borrower in connection with the services provided by the closing agents are included in the finance charge and therefore in the Annual Percentage Rate (APR) calculation, and must be accurately and consistently disclosed on the documents.  It is not appropriate or acceptable to estimate the closing/settlement fees when preparing the final Truth in Lending/Itemization of Amount financed.

Not only were there these problems associated with the loan and the disclosures; there were also problems associated with the creditors being paid off ( See Exhibit 7).   On August 13, 2002 I retained James McGuire, from Roshka ,Heyman a & Dewulf to represent me with this problems and other issues pertaining to this loan.  On August 16, 2002, James McGuire, sent a letter to Citibank, regarding the Choice Visa Card that was to have been paid off with the refinance.  Security Title Agency had the wrong account number.  For four months this account had been in dispute.  I have correspondence between Security Title Agency and American Residential regarding the payoff of my credit cards (See Exhibit 1B) it took me to hire an attorney and incur legal fees to get this matter resolved.  Why?

There were numerous attempts made to resolve the problems I was having with Fremont Investment & Loan and American Residential Funding, Inc. (See Exhibits 10 and 11).  On October 10, 2002, James McGuire sent a letter to both American Residential Funding, Inc. and Fremont Investment & Loan stating that he was representing me and an authorization was attached.  He was requesting a complete copy of my file.  On October

29, 2002 James sent another letter to both American Residential Funding, Inc., and Fremont Investment & Loan, indicating that he had not heard from them regarding his request for a complete copy of my file (See Exhibit 12). It had been approximately twenty (20) days from his original request. This is a violation of Section 6 of RESPA (12 U.S.C 2605) failure to respond to a Qualified Written Request within twenty (20) business days. No later than 60 Business days after receiving my request the Servicer must make appropriate corrections to my account and must provide me with a written clarification regarding any dispute. Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of this Section.

On December 9, 2002, (See Exhibit 13), there was a letter from Fairbanks Capital Corp., regarding a payoff quote of 523,498.95. This amount included a 17,891.92 prepayment penalty. On December 18, 2002, (See Exhibit 14), there was a letter from James McGuire to Mr. John Lewis at Fairbanks Capital Corporation 3815 S.W. Temple P.O. Box 65250 Salt Lake City, Utah 84115-4412 regarding my loan. In this letter to Mr. Lewis, Mr. McGuire requested that the prepayment of 17,891.92 be waived and discussed the possibility of me refinancing my loan. On December 20, 2002,(See Exhibit 15) there was a letter from James McGuire, to Mr. Lewis regarding my request for a Short Pay.

Exhibit 16. Dated January 14, 2003. A letter from James McGuire to Mr. Aaron Lewis( Fairbanks Capital Corp., Salt Lake City, Utah headquarters) regarding the decision of Fairbanks' offer to waive the 17,878.96 prepayment penalty and me not pursuing Fairbanks in my forthcoming suit.

Exhibit 17. Dated January 22, 2003. A letter from James McGuire to me, regarding the Settlement Agreement and General Release of Claims from Fairbanks Capital Corp. I chose not to sign this agreement because I would have to forever release all claims against Fairbanks. If I agreed to this Settlement I would never be able to rescind my loan.

Exhibit 18. Dated March 28,2003. A letter from James McGuire to me, regarding me trying to obtain refinancing of my loan before the interest rate increases.

Exhibit 19. Assignments. On September 12, 2002, I received a Notice from Fremont Investment & Loan stating that my principal balance was 498,892.89. It was an advisement that this Notice was given to me in connection with the collection of my loan. I had only had this loan for five months and was never late. I hired an attorney to help unravel this nightmare and the problem was only getting worse. On September 16, 2002, I received a Notice of Assignment, Sale, or Transfer of Servicing Rights from Fremont Investment & Loan. My new servicer was Fairbanks Capital Corporation. The date that the new servicer was to start accepting payments was October 1, 2002. This Assignment was not recorded.

28.        This Assignment of Deed of Trust, listed me as the Trustor and Security Title

1   even if they seem technical.  See Rodash v. AIB Mortgage Co., 16F.3d 1142, 1145, 1149
2   (11th Cir. 1994).

3
4   30.     On June 25, 2003, my attorney drafted a copy of my Right of Rescission that was
    never sent. (See Exhibit20).   On July 21, 2003 my attorney James McGuire received a fax
5   from Fairbanks Capital Corp., out of Salt Lake City, Utah.  It was a Reinstatement Quote
    in the amount of 30,076.49(See Exhibit 2)

6       I gave my formal and proper notice of my election to rescind my loan pursuant to 15
7   U.S.C. 1635 of the Truth In Lending Act for the failure to be provided with a signed and
    dated copy of the Notice of Right to Rescind/Cancel and the failure to be provided the
8   appropriate disclosures. This violation of the TILA gives rise to an extended right of
    rescission for up to three(3) years.  This was a Predatory Loan and I was a victim of
9   Predatory Lending .

10
11      I did some research on Predatory Lending in Arizona and discovered the Predatory
    Lending Guide issued in July 2002, it is a consumer education booklet to provide
12  information on predatory lending  by the Office of Attorney General Janet Napolitano(See
    Exhibit1)discusses the deceptive practices of Predatory Lending and how The Attorney
13  General investigates allegations of Predatory Lending practices.  I filed a complaint with
    the Attorney General's in October 2005, complaint #05-19155.  It was regarding the
14  Predatory Loan and wrongful foreclosure.

15      The handbook discusses how Predatory Lenders charge excessive fees, points, interest
    rates.  The handbook discusses the "warning signs" of a Predatory Loan such as
16  misrepresentations: where the loan officer or lender may offer you one set of loan terms
    and then change them at the closing.  Asset-Based Lending: where the Predatory Lender
17  gives you a loan based on the equity in your home, not on your ability to repay or on your
    income. (My loan was approved and funded before my income was verified. (See Exhibit 1
18  and my loan application).  My income was reported as 12,000.00 a month as an
    Instructional Assistant combined with my child support.  This was a lie. High closing
19  costs: unusually high closing costs such as appraisal fees (I never even signed a document
    agreeing to an appraisal).  Other warning signs include: telling you to sign incomplete or
20  blank forms-the lender says it will fill in later, tells you it's not important to read all the
    fine print in the loan papers or hurries you to sign the papers an says you can't have copies
21  of documents that you have signed.  I was a victim of Predatory Lending.
22
23      The purpose of Arizona State Senate Bill 1343(See Exhibit 1) is to prohibit and restrict
    lending activities and charges associated with loans made for home purchases. It defines
24  Predatory Lending as a loan exceeding three percent closing costs and exceeding different

Agency as the Trustee.  FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to U.S BANK NATIONAL ASSOCIATION AS TRUSTEE OF CSFB HEAT SERIES 2002-2 all beneficial interest under that certain Deed of Trust dated March 25, 2002, executed by (see above).  The document was signed/stamped by Madeline Ramos and Michael J.  Brandt; Document Control Officers .This document was dated on May 13, 2003.  Fremont Investment & Loan by Fairbanks Capital Corp. as attorney in fact.  On page 2 of the Assignment there was  a statement that states : For Corporate –Atty-In-Fact Acknowledgement ; Commonwealth of Pennsylvania; County of Montgomery; On 5/13/03 before me the undersigned, a Notary Public in and for said County and State, personally appeared Madeline Ramos*(*Michael J. Brandt), personally known to me to be the Assistant Secretary/Document Control, of Fairbanks Capital Corp. the corporation that executed and whose name is subscribed to the within instrument as the Attorney-In-Fact of Fremont Investment and Loan, and acknowledged to me that they subscribed the name of Fremont Investment and Loan, thereto as Principle and the name of Fairbanks Capital Corp, as Attorney-In- Fact for said Fremont Investment and Loan, and that said Fairbanks Capital Corp., executed the same as such Attorney-In-Fact.  Nikole Shelton Notary Public, Hatboro Boro, Montgomery County. The Assignment was recorded on May 28, 2002.

Also on May 28, 2003 there was a Substitution of Trustee.  NOTICE IS HEREBY GIVEN :  That the undersigned Beneficiary hereby appoints T.D. Service Company of Arizona, 1820 E. First St., Suite 210, P.O. Box 11988, Santa Ana, CA  92711-1988, successor Trustee under the Deed of Trust described as: Trustor: Kathi Sharpe Original Beneficiary: Fremont Investment and Loan Original Trustee: Security Title Agency.  This was dated on 5/13/03.  It stated that U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE OF CSFB HEAT SERIES 2002-2 by Fairbanks Capital Corp Its Attorney In Fact.  This Assignment was also signed/stamped by Madeline Ramos and Michael J .Brandt: Document Control Officers.  The only difference between the two Assignments  is that on the Substitution of Trustee, Madeline Ramos *(Michael J. Ramos), of Fairbanks Capital Corp the corporation that executed and whose name is subscribed to the within instrument  as the Attorney-In-Fact of US BANK  TRUST NATIONAL ASSOCIATION AS Trustee, and acknowledged  to me that they subscribed the name US Bank Trust National Association as Trustee thereto as Principle and the name of Fairbanks  Capital Corp, as Attorney-In-Fact for said US Bank Trust National Association as Trustee,  and that said Fairbanks Capital Corp, ., executed the same as such Attorney –In-Fact.  The last document recorded was the Notice of Trustee Sale.  T.D. Service Company of Arizona, as duly appointed Trustee under the following described Deed of Trust Will sell etc.  U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE OF CSFB SERIES 2002-2 was the Beneficiary. Their address was C/O Fairbanks Capital Corp, 338 S. War Minster Rd., Hatboro, PA., 19040.  I was listed as the Original Trustee.

When reviewing these Assignments it is apparent that Fairbanks Capital Corp., had an agency relationship with Fremont Investment & Loan, as they were their Attorney-In-Fact.  Fairbanks was also the Attorney-In-Fact for U.S. Bank National Association as Trustee of CSFB HEAT SERTES 2002-2. I was never informed that U.S. Bank National

1  Association was involved in my loan.☐

2    See Exhibit 19.  HUD regulations require mortgage servicers to report all FHA
   mortgages that go into default within 30 days of default.  HUD also has a procedure in
3  place for loss mitigation, a process in which a lender helps a borrower who's delinquent in
   loan payments.  In an FHA mortgage, the FHA will reimburse the lender for certain costs
4  if the borrower meets the guidelines, such as length of time that the borrower has owned
   the home and the like.  Loss mitigation plans include receiving a special forbearance
5  (where the borrower pays a lower payment or stops payments for a period of time), a
   partial claim (where a borrower can get an interest free loan from HUD to bring his
6  payments up to date) and mortgage modification(where the life of the loan is lengthened so
7  that the borrower can make smaller payments each month).

8   Fairbanks Capital Corporation violated the Homeownership Counseling Act;  12 U.S.C.
   1701x.  The Homeownership Counseling Act., requires that lender give information  about
9  available counseling resources  to qualifying borrowers who fail to pay any amount due.
   Homeowners who qualify are those whose loan is secured by their primary residence and
10 those who are not expected to be able to make up a deficiency in a reasonable amount of
   time due to an unexpected loss or reduction of employment income by the borrower
11 someone who contributes to the household income.  The lender/servicer must provide
   information about any of the lender's counseling services ( if any are available) and a list
12 of HUD-approved homeownership counseling organizations or even HUD's toll free
   number where the department will provide a list of such organizations. With all of the
13 problems associated with this loan and being in foreclosure decide the foreclosure was to
14 rescind my loan under the Federal Truth In Lending Act.

15

16 29.  The Truth in Lending Act (TILA), is a cornerstone of consumer credit legislation. In
   1968, TILA was enacted to inform consumers about the cost of credit so they could make
17 informed credit decisions and to protect them against unfair credit practices. The statute is
   Congress's effort to guarantee the accurate and meaningful disclosure of the costs of
18 consumer credit and   thereby to enable consumers to make informed choices in the
   marketplace. See 15 U.S.C. 1601(a). It is implemented by the Federal Reserve Board's
19 Regulation Z at 12 CFR, Part 226 and by the Federal Reserve Board's Official Staff
   Commentary to Regulation Z to (OSC).  The Act is designed to protect borrowers who are
20 not on an equal footing with the creditors either in bargaining power or with respect to the
   knowledge of credit terms.  TILA was passed to aid the unsophisticated consumer.  See
21 Thomka v. A.Z. Chevrolet, Inc; 619 F.2d 246 (3d Cir. 1980).  The Act is also remedial and
22 must be liberally construed in favor of borrowers. See King v. California. 784 F.2d 910
   (9thCir. 1986).  Except where Congress  has relieved lenders of liability for
23 noncompliance, it is a strict liability statute.  Courts should continue to assure that
   consumers are accorded the full remedies available under the Act for violations found,

24

percentages over a U.S. Treasury security depending on whether the mortgage is a first or second mortgage.

Based on these criteria S.B. 1343 restricts or prohibits various costs, fees, and practices of lenders or brokers who are engaging in the sub-prime market. Some of the prohibitions include financing more than three percent of the total loan amount in points and fees, negative amortization, and mandatory arbitration that limits access to the judicial system for claims and defense. Assigns brokers a fiduciary duty to their borrower, regardless of other responsibilities of the broker relating to the loan.

Senate Bill 1343-452R also establishes a) a violation of the measure as a Consumer Fraud and subject to enforcement measures; b) a " preponderance of the evidence" as burden of proof regarding a violation of this measure: c)punitive and compensatory damages relating to violations of the measure, including reasonable costs and fees: and d) procedures for restitution by creditors lending in good faith who find they inadvertently violated the law. It also permits a borrower to asset a violation of this measure as a defense or counter-claim to any type of default action, including foreclosure action. The time was right to rescind my loan. In order to foreclose Fairbanks violated this measure.

31.    The Right of Rescission is a protection given to borrowers under the Truth in Lending Act. This right gives borrowers of certain types of loans the opportunity to cancel their loan within three (3) business days of signing the loan documents and qualify to receive a full refund of any monies paid. The three (3) days is called a "cooling off" period to be certain that this is exactly the loan you expected. In order for the loan to fall under the Right of Rescission protection laws, the loan must be to refinance a loan on your home with a new lender'

Under the Federal Truth in Lending Law, each borrower, or person with ownership interest in the property is to be provided with two (2) completed copies of the notice of right to cancel. It is the lender's obligation to complete these forms. See 15 U.S.C. 1635(a). Reg. Z 226.5(b), 226.23(b). The failure to provide two adequate copies of the Notice of the Right to Cancel extends the Right to Rescind to three (3 years) under the Federal Truth in Lending Act. American Residential Funding Inc., and Fremont Investment & Loan failed to provide me with two (2) completed and accurate copies of the Notice of Right to cancel.

When I signed my Notice of Right to Cancel, the date for when I received a copy of the notice was blank. The NORTC was incomplete. The lender is required to fill in the form and dates.

Not only is the Lender required to provide two (2) completed copies of the NORTC , the lender is required to provide the borrower with a copy of all the material TILA

disclosures.  Failure to meet this requirement also provides an extended three (3) year right to rescind.  See 15 U.S.C. 1635(a); RegZ 226.25 , 226.23, 225.15(a)(3).  If a creditor fails to make any of the specified material disclosures, they have violated TILA.  The material disclosures required to be displayed in a certain way to allow the consumer ease of comparison are the APR, the Finance Charge, the Amount Financed, the Total of Payments and Schedule of Payments.  This is usually the final TILDS.  I never received a copy of the final TILDS on March 25, 2002.

Even if the lender argues that I signed an acknowledgement that I received all of the appropriate disclosures, this merely raises a rebuttable presumption under TILA.  If I did receive a complete set of copies of everything I signed, why is it that I only have copies?  I have no originals from the signing/closing.

My Right of rescission was exercised on July 24, 2002 under 226.23(3).  There is also legal precedence for "tolling" the statute beyond three (3) years where fraudulent concealment is shown.  See Bank of New York v. Walden. 751 N.Y. S.2d 341(Sup.Ct. 2002).  In order to exercise the Right of rescission under 226.23(2) I was required to notify Fremont Investment & Loan and Fairbanks Capital Corp. in writing by mail or other means of written communication.  When a consumer rescinds their loan, they are no longer liable for any amount, including any finance charge the security interest is voided.

32. On August 20, 2003, (See Exhibit 22A) James McGuire faxed a copy of my proper and formal Right of Rescission to John Lewis, at Fairbanks Capital Corp., in Salt Lake City , Utah., to stop the Trustee Sale.  Both the original Lender (Fremont) and Servicer (Fairbanks) had been   noticed of my right of rescission notice on July 24, 2002.

Exhibit 22B.  Shows a faxed communication  dated August 21, 2002 between James McGuire and Denise B. Patrick from T.D. Service Company.  T.D. Service Company agreed to postpone the Trustee Sale, based upon the information  (my right of rescission notice) provided to Fairbanks Capital Corp., and U.S. Bank.  If the sale was not going to be postponed we were prepared to file a TRO.

Exhibit 22C.  A letter dated August 21, 2003 from T.D. Service Company to Michael Morano at Fairbsnks Capital Corp., in Hatboro, PA., verifying the postponement of the Trustee's Sale to September 30, 2003.

Exhibit 22D.  A letter dated August 21, 2003, to Jared Lewis at Fairbanks Capital Corp., Salt Lake City, Utah., the Loan Servicing Center.  The letter discussed the postponement of the Trustee's Sale and the fact that Fairbanks Capital Corp. never received a copy of my notice of rescission and that another one would be faxed to them.

Exhibit 22F.  A letter from Denise B. Patrick from T.D. Service Company to James

McGuire , dated September 24, 2003regarding the Cancellation of the Trustee's Sale scheduled for September 30, 2003.

Exhibit 22G. A letter from James McGuire, dated September 26, 2003,along with a copy of the recorded Cancellation of Notice of Trustee's Sale,

Exhibit 23. A letter dated October 21, 2003 from John Kerkorian at Gallagher & Kennedy, stating that they had been retained by Fairbanks Capital Corporation to respond to my Right of Rescission claim. If you look at the copy of Right of Rescission, the date on the copy indicates that the Right of Rescission Notice was received by the Loan Resolution Department on September 25, 2003. When Fairbanks responded to the Right of Rescission Notice on October 21, 2002 (this was a violation of TILA, they waited 80 days to respond to the notice) they indicated that I had received two(2) copies of the NORTC and the dispute was resolved. They included a copy of the NORTC that was filled in properly. If you look closely at the dates, they are in different handwriting. One of the handwriting's is identical to that of Susan Poonvichit, the funder who signed the Dispute Resolution Agreement on March 29, 2002. There is now a recognized dispute.

33.   The failure of Fairbanks to respond to my Right of Rescission notice within twenty (20) days was a violation of RESPA 6.  The loan servicer must provide the borrower or the borrower's attorney with a written acknowledgement within twenty (20) Business Days of receipt of the Borrower's request.  The loan servicer has no more than sixty (60) Business days after receiving the borrower's request to correct the errors on the borrower's loan account or the servicing company must provide the borrower with a written  clarification disputing any such error.

The failure of Fairbanks to respond to my Right of Rescission Notice within twenty(20) days is a violation of TILA.

Within twenty (20) calendar days after the receipt of a notice of rescission if the creditor/lender disputes the Right to Rescind, they have twenty (20) days to file a legal action for declaratory relief. See U.S.C. 1625(b).  (See  Exhibit 48).  In Large vs. Conseco, 292 F3d 49 Large v. Conseco, the Court ruled that "If a Lender disputes a borrower's purported Right to Rescind, the designated decision maker –here an arbitrator – must decide whether the conditions for rescission have been met.  Until such a decision is made, the Larges have only advanced a claim seeking rescission."  Fairbanks Capital Corp., was not the designated decision maker.  The Right of Rescission is not your average dispute, there should have been a resolution of the Rescission claim prior to the foreclosure.

Even assuming that there are two signed and completed copies of the NORTC, this merely raises a rebuttable presumption that the lender delivered two copies to the

borrower.  See 15 U.S.C. 1635(c)., and Johnson v. New Century Mortgage Corp., 320 F. Supp.2D 606, 611 (E.D. Mich. 2004) Courts permit competent testimony to rebut this assertion of the lender.  The critical factor is not whether  the creditor has two signed and completed copies of the notice, but whether the borrower has possession of two signed, dated and completed copies of the NORTC.  Whether the borrowers were delivered a blank notice of right to cancel is a question of fact that will not be decided on a motion to dismiss.  See Clay v. Johnson, 77 F. Supp 2D 879 (N.D. Ill. 1999).  The debtor's denial of receipt of the notices and disclosures creates a question of fact that will not be decided on summary judgment  even where the borrower signed acknowledgement of having received two copies of the notice.  See Moore v. Mortgagestar, Inc. 2002 U.S. Dist. LEXIS 27457, (W.D W. Va. Dec 18,2002).  Once the borrower rebuts the presumption of delivery (through competent testimony, affidavits, etc.) the burden shifts to the creditor to prove the delivery of the documents.  See  In Bell v. Parkway Mortgage, Inc., 309 B.R. 139, 157 (Bankr. E.D. Pa 204).  In addition, where the debtors testify that they did not receive the disclosures(even if not "totally convincing"), the debtor's should prevail if the creditor cannot produce from its own records any copies of the disclosures.  See In re Pinder. 83 B.R. 905, 913.  In most cases, especially where the borrower has credibility and kept track of all their loan documents( and where a mobile notary was used to sign the loan documents ) the borrower can normally make a fair argument to rebut any assertion that the lender complied with the clear and conspicuous notice requirements and can counter any such assertion with competent testimonial evidence.  Fairbanks ignored my right of rescission and my claims and the rebuttable presumption under TILA.  The fact that a mobile notary, who was also the loan officer would not be enough to rescind the loan.

34.    When a consumer rescinds a transaction, the security interest  and promissory note becomes void, 15 U.S.C. 1635(b);Reg Z -226.15(d)(1), 226.23(d)(1).See Official Staff Commentary 226.23(d)(2)-1. (See Willis v. Friedman, Clearinghouse No. 54,564 (Md. Ct. Spec. App. May 2,2002)(Once the right to rescind is exercised, the security interest in the property becomes void ab initio).  Thus, the security interest is void and of no legal effect irrespective of whether the  creditor  makes any affirmative response to the rescind. (See Family Financial Services v. Spencer, 677 A.2d 479(Conn. App 1996)(all that is required is notification of the intent to rescind, and the agreement is automatically rescinded). Unless the Court alters the procedure, the courts have the discretion.  Where the TILA statute is clear it must be followed.  Fairbanks made no movement towards voiding the security interest or filing a declaratory action regarding my disputed right of rescission within twenty(20) days.  See 15 U.S.C. (b); Reg Z-226.15(d)(2),226.23(d)(2).

TILA rescission applies to all assignees of the loan.  There is no "holder in due course" argument or anything like that.  See 15 U.S.C. 1641(c), Belini w. Washington Washington 412 F. 3d (1st Cir.2005)  and Ocwen Fed. Bank v. Russell, 53 P. 3d 312 (Haw Ct. App.2002), the Court rejected the assignees holder  in due argument as being no defense to rescission.  As other courts have held:"without such protection for the consumer the right of rescission    would provide little or no effective remedy".  See Stone v. Mehlberg. 728

F. Supp. 1341, 1348.   ( W.D Mich 1989).  A loan servicer is deemed an assignee if it"is or was the holder of the obligation." While assignees are only liable for TILA "statutory damages" that are apparent on the face of the loan document assignees are subject to the rescission right to the same     extent as the original creditor. 15U.S.C. 1641 (c) states: Right of Rescisssion  by consumer is unaffected.  Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation.  TILA Section 1641 addresses the circumstances under which an assignee may be liable for violations committed by the prior order.  For loans- such as this one-which are secured by real estate, the statute provides as follows: Liability of assignee for consumer credit transaction secured by real property.

Exhibit 24.  A letter dated October 30, 2003, from James McGuire to John Kerkorian regarding my rescission.  James informs Fairbanks through their counsel , as a side note, that Fairbanks's failure to remove its lien on Ms. Sharpe's property within the statutory time frame is an independent violation of the Truth in Lending Act.

Exhibit 25.  A letter dated November 12, 2003, from John Kerkorian, stating  that based upon the information that was provided to him, he saw no basis for a rescission.  Mr. Kerkorian also asked  for what authority did we base our position that the" alleged failure to date the Notice of Rescission is sufficient by itself, to extend the period for rescission." He was unaware that it was the lender 's responsibility and obligation to fill in the dates on the NORTC, and that the NORTC was incomplete.  He forgot that I never received two (2) complete copies of the NORTC.  The fact that he mentioned that the date was incomplete not inserted is interesting.  No mention of tender.

Exhibit 26.  A letter from James dated November 19, 2003 regarding settlement options with Fairbanks' after meeting with their counsel.

Exhibit 27.  On December 22, 2003, I received a letter from James regarding a forbearance agreement from Fairbanks.  I declined their agreement.  Nowhere has it been mentioned that the FTC and HUD had Preliminarily approved a Settlement Agreement.

35.   The second step of TILA states that the Lender has a tender obligation to the borrower by statute, it is the Lender who must tender first, not the borrower.  The question of who must tender first can only be modified by the Judge.  As part of the Lender's legal tender obligation under TILA, the lender must return any money, including that which may have been passed on to a third party, such as a broker or an appraiser and to take any action necessary to reflect the termination of the security interest within twenty (20) calendar days of receiving the rescission notice.  See 15 U.S.C. 1635(b); RegZ-226.25(d)(2), 226.23(d)(2).  Since the rescission process was intended to be self-enforcing, failure to comply with the rescission obligations subjects Fairbanks to potential liability.

1    If the creditor has delivered any money or property, the consumer may retain
possession until the creditor has met its obligation under the TILA Step 1.  Tender was
2  never discussed at all.  What would the amount be?    I actively sought to refinance.

3    Courts have the power to alter whether the lender has to tender first, or the borrower has
to tender first.  See Yamamoto v. Bank of New York, 329F.3d 1167(9th Cir.2003), but see
4  Semar v. Platte Valley Federal Savings & Loan Association, 791 F.2d 699, 705-06 (9th
Cir.1986)(which stands for the propostion that the Court can alter the "procedure" of TILA
5  but not the" substance" of TILA.  The "substance" of TILA is that the security interest
6  becomes void   upon the exercise of rescission, (although the Court can alter this procedure
by requiring the borrower to tender first).  In Yamamoto, the Court held: "There is no
7  reason why a Court that may alter the sequence of procedures after deciding that rescission
is warranted, may not do so before deciding that rescission is warranted when it finds that,
8  assuming grounds for rescission exist, rescission still could not be enforced because the
borrower cannot comply with the borrower's rescission obligations no matter what,  Such a
9  decision lies within the Court's equitable discretion,  taking into consideration all the
circumstances including the nature of the violations and the borrower's ability to repay the
10  proceeds.  If it is clear from the evidence that the borrower lacks capacity to pay back what
has been received (less interest, finance charges, etc.).  the Court  does not lack discretion
11  to do before trial what it could do after.  Determinations regarding rescission procedures
shall be made on a "case-by-case "basis, in light of the record adduced".  The Court has
12  the ultimate power and discretion and does not necessarily require that the borrower prove
their ability to tender as a pre-condition to exercising rescission rights.
13

14    In fact, a California Court, in Pelayo v. Home Capital Funding. Slip Copy, 2009 WL.
1459419 S.D. Cal., 2009, recently denied a lenders motion to dismiss a TILA rescission
15  claim where the Defendant argued that the borrower was required to tender before
rescission could be allowed.  The Court denied the Defendant's motion to dismiss.
16

17    After the Lender has fulfilled their obligations under TILA, then the borrower must
tender to the lender all proceeds they received in connection with the loan transaction.
18  See 15 U.S.C. 1635(b).

19

20  Exhibit 28.  Notice of Proposed Class Action Settlement  and Settlement Hearing

21  Exhibit 29.  Fairbanks Reaches Settlement with FTC and Private Class Summary

22  Exhibit 30.  USA v. Fairbanks Capital Corp.  Alanna L. Curry, et al v. Fairbanks Capital
Corp.  Claim forms for Foreclosure,  Late Fees /Default Related Fees and Prepayment
23  Penalty.

24  Exhibit 31.  USA v. Fairbanks Capital Corporation Complaint for Permanent Injunction

1  and other Equitable Relief and Monetary Civil Penalties

2  Exhibit 32.  Order Preliminarily Approving Class Action Settlement, Conditionally Certifying Class for Settlement Purposes and With Respect to Notice, Settlement Hearing

3  and Administration In Each Case

4  Exhibit 33.  Order Preliminarily Approving Stipulated Final Judgment and Order As To Fairbanks Capital Corp., and Fairbanks Capital Holding Corp.

5

6  Exhibit 34.  Alanna L. Curry, et al., v. Fairbanks Capital Corporation Settlement Agreement and Release

7  Exhibit 35.  Appendix 1 – Default Resolution Program

8  Exhibit 36.  Fairbanks Capital Corp. Operational Practices Agreement In Connection With Settlement of Curry et al. v. Fairbanks Capital Corporation

9

10  Exhibit 37.  Stipulated Final Judgment and Order as to Thomas D. Basmajian

11  Exhibit 38.  Modified Stipulated Final Judgment and Order

12  Exhibit 39.  Letter from James McGuire, dated January 8, 2004, discussing the inadequacies of the Forbearance Agreement, requesting compliance with the rescission

13  demand and the possibility of filing a lawsuit and me providing him with a 20,000.00 retainer.

14

15  Exhibit 40.  A letter from John Kerkorian dated January 13, 2004 regarding the Forbearance Agreement. If they did not hear from us before January 20, 2004, Fairbanks Capital Corp. will take appropriate action relative to this matter, which may include

16  institution of foreclosure proceedings.  This was a direct violation of the Injunctive Relief provision of the Settlement Agreement.

17

18  Exhibit 41.  A letter dated January 14, 2004 from James to Mr. Kerkorian regarding the Forbearance Agreement and the evaluation of my options.

19  Exhibit 42.  A letter dated February 27, 2004 from James regarding a Demand for

20  Arbitration from Fairbanks.  The Demand for Arbitration was filed seeking a declaratory judgment concerning the rights, obligations and legal relationship between myself and

21  Fairbanks.

22  Exhibit 43.  A letter dated March 3, 2004 from Philip Sumner at Gallagher & Kennedy withdrawing from arbitration without prejudice.  At this point I should have been referred

23  to the Default Resolution Program, as provided under the Settlement Agreement.  Under the Settlement Agreement, I could not pursue any other action, because all of my claims

24

1   had been  forever released and the attorneys for Fairbanks were aware of this.

2   Exhibit 44.  A letter dated March 5, 2004 from James McGuire, regarding Fairbanks'
    decision to withdraw from arbitration and proceed with the foreclosure.

3

    Exhibit 45.  A letter dated March 5, 2004 from Philip Sumner, confirming the withdraw
4   from arbitration and proceeding with the foreclosure. There was no attempt to resolve the
    Rescission dispute, Fairbanks was the decision-maker.
5

    Exhibit 46.  A letter dated March 8, 2004 from the American Arbitration Association,
6   confirming the withdrawl  from arbitration.

7   Exhibit 47.  A letter dated March 18, 2004 from James McGuire regarding my files and the
    retention of Joe Huey as my new counsel.
8

9   Exhibit 48.  Large vs. Conseco Finance Servicing Corporation 292  and  Thompson vs.
    Irwin Home Equity Corp. and Irwin Union Bank & Trust Co. 300F.3d 88

10
    Exhibit 49.  Copy of my complaint to the FTC Ref No: 4409037.  The complaint date was
11  May 8, 2004.  It was entered on May 10, 2004.

12  Exhibit 50.  A letter from Fairbanks Capital Corp., dated on May 17, 2004 regarding my
    complaint with the FTC.   The letter was cc: to Alison Brown.  There was no mention of
13  the Settlement Agreement.

14  Exhibit 51.  A letter from Fairbanks Capital Corp. dated June 3, 2004 regarding the
    complaint and the origination of the loan.
15

16  Exhibit 52.  A fax dated June 7, 2004 from Joe Huey to Philip Sumner in response to Mr.
    Sumner's fax on June 4, 2004, regarding the stay of the Trustee's Sale and the fact that the
17  loan officer (Mavis Jones) was willing to testify.

18  Exhibit 53.  A letter dated July 8, 2004 from Philip Sumner  to Joe Huey, regarding
    contacting Mavis Jones and the evaluation of the merit of my allegations pertaining to my
19  Right of Rescission claims.

20  Exhibit 54.  A letter from Philip Sumner to Joe Huey dated July 22, 2004 regarding the
    contact information for Mavis Jones and the proposal of mediation.  It had been over a
21  year since my formal and proper notice of rescission and neither Fairbanks or Fremont
    Investment & Loan (both who had been properly noticed on July 24, 2003) had honored it.
22
    Exhibit 55.  A letter from Joe Huey to Vincent Rinehart, CEO of American Residential
23  Funding, Inc., dated September 10, 2004, regarding my loan transaction.  Mr. Huey
    requested that he be contacted within 10 days of this letter as to whether American
24

Residential Funding Inc., would agree to participate in the arbitration. The foreclosure occurred before Mr. Huey received a response.

Exhibit 56. A letter from Joe Huey to Philip Sumner dated September 10, 2004, asking if Fairbanks would participate in arbitration and stay the pending foreclosure. The Default Resolution Program and the Operational Practices Changes were in effect. At this point in time Fairbanks should have provided us with notice of the Settlement Agreement, that my request for arbitration was a Released Claim.

Exhibit 57. A letter from Joe Huey to Philip Sumner, dated September 15, 2004 regarding my obtaining financing to pay off Fairbanks in the event that the Rescission would occur, not foreclosure.

Exhibit 58. A letter from Philip Sumner to Joe Huey dated September 17, 2004 stating that the foreclosure would proceed on September 21, 2004. The house was sold on September 21, 2004 and my family's life was changed forever.

36.     After the foreclosure I retained R. Harvey Dye in September 2004, to represent me in a wrongful foreclosure and breach of contract lawsuit against Fremont Investment & Loan, Fairbanks Capital Corp., and American Residential Funding Inc., for Fraud, RESPA and TILA violations (See Exhibit 59 the Verified Complaint) . In March 2005, he filed the Verified Complaint. In April 2005, he filed my First Amended Complaint (See Exhibit 60). This lawsuit was very expensive to finance and I was running out of money.

Exhibit 59. A copy of my Verified Complaint (Fraud, RESPA, TILA violations) against Fremont Investment & Loan, Fairbanks Capital Corp., and American Residential Funding, Inc, dated March 31, 2005

Exhibit 60. A copy of my First Amended Complaint (Fraud, RESPA, TILA Violations) dated April 18, 2005.

Exhibit 61. A letter from Harvey Dye to Philip Sumner regarding acceptance of Service dated April 13, 2005. In this letter Mr. Sumner, informed Harvey that Fairbanks Capital Corp., had changed their name to Select Portfolio Servicing, Inc. The reason for the name change was a result of the Settlement Agreement.   Again there was notice provided of the Settlement Agreement and that by the filing of this lawsuit was a Released Claim and a violation of the Settlement Agreement. This action should have been dismissed.

Exhibit 62. A Motion to Compel Arbitration and to Dismiss Action from Fremont Investment & Loan dated June 29, 2005 and a copy of the Dispute Resolution Agreement I

1    signed on March 25, 2002 and also  signed by the funder Susan Poonvicht on March 29,
2    2002.  Was the Dispute Arbitration Agreement even valid considering that the loan was
     closed on March 25, 2002 and the DRA was signed on March 29, 2002?  I could have
3    never received a copy and if I had a copy to review I would have rescinded the loan.

4    Exhibit 63.  A Certificate Regarding Compulsory Arbitration from Gallagher & Kennedy
     dated July 5, 2005.

5    Exhibit 64.   Verified Answer of Defendant Select Portfolio Servicing, Inc. dated July
6    8, 2005.

7    Exhibit 65.  A letter from Harvey Dye to the Court, regarding an Application and Affidavit
     for Entry of Default dated July 15, 2005.

8    Exhibit 66.  An Answer of Defendant American Residential Funding, Inc., from their
9    attorney Robert Porter,  dated July 27, 2005.

10   Exhibit 67.   A Response to Motion to Compel and to Dismiss Action from Harvey Dye,
     dated August 8, 2005.

11   Exhibit 68.  Motion to Withdraw from Harvey Dye dated August 11, 2005.  It was a
12   mutual decision for Harvey Dye to withdraw.  I had spent all of the money that I had to
     fight this lawsuit.  Harvey told me that it would cost over 100,000.00 to continue fighting
13   this lawsuit and I could not afford it.

14   Exhibit 69.  A Response of Fremont Investment & Loan Company to Counsel's Motion to
15   Withdraw from Jeffrey Leonard dated August 25, 2005.

16   Exhibit 70.  Reply Memorandum in Support of Motion to Compel Arbitration and to
     Dismiss Action dated August 26, 2005 from Jeffrey Leonard, counsel for Fremont
17   Investment & Loan.

18   Exhibit 71.  A Joinder of Defendant American Residential Funding, Inc., to Motion for
     Arbitration Made by Defendant Fremont Investment & Loan Company dated September 6,
19   2005.

20   Exhibit 72.   An Order of Withdrawal of Counsel from Harvey Dye, dated September 13,
     2005.

21   Exhibit 73.  Respondent Select Portfolio Servicing Inc., Reply in Support of Its Motion for
22   Summary Judgment, from Gallagher & Kennedy counsel for Select Portfolio  Servicing
     Inc., dated April 17, 2007.

23   Exhibit 74.  Respondent Select Portfolio Servicing, Inc.'s Fifth Supplemental Disclosure
24

1  dated March 30, 2007 from Gallagher & Kennedy to the Court.

2  Exhibit 75.  Application for Confirmation of Arbitration Award from Gallagher &
   Kennedy dated February 4, 2008.

3

4

       After Mr. Dye withdrew from my case in September 2005, I had to appear in front of
5  Commissioner Armstrong and ask for more time regarding the arbitration.  I was granted
   an extension.  I agreed to the arbitration because I wanted to have my day in Court.
6

7

8  37.  In July 2006, I retained Mark Svedja, on a contingency basis.  It was also around this
   time that I started investigating Fairbanks Capital Corporation and learned of the
9  Settlement Agreements and that I was a Class Member.  That according to the provisions
   of the Settlement Agreement I was entitled to certain benefits.  This is when I learned of
10 the Injunctive Relief provision, regarding Fairbanks taking any actions towards foreclosure
   and the Reserved Claims and Defenses.  The irony in this is that, I was compelled to
11 arbitrate whether or not my Right of Rescission claim was valid but the foreclosure had
   already occurred.  If the arbitrator had ruled in my favor that my Rescission Claim was
12 valid, my home was still sold.  Any of the fees, costs and/or awards could have been
   applied towards the "tender" amount.  Tender was never an issue.  This should have taken
13 place prior to the foreclosure.  All disputes had to be resolved before any actions towards
   foreclosure under the Settlement Agreement.  After the Settlement Agreement was
14 approved in 2003, I could not have initiated any proceeding or file a claim for damages in
   any court or arbitration proceeding, because it was a Released Claim.  So, therefore I was
15 prohibited from filing any claim for damages of any TILA violations.

16    The arbitration took place in March 2007 and the arbitrator ruled in the favor of
17 Fairbanks, stating that my Right of Rescission claim was time barred.  If the arbitration
   had taken place in 2003 after receiving my Right of Rescission notice, I would have had an
18 opportunity to save my home and we could have discussed the role of notarial misconduct
   and voided the security.  The arbitrator, stated that they could not compel Mavis Jones to
19 testify unless all parties agreed.  They did not.  Mavis Jones was the loan officer, she was
   at the closing and she was willing to testify to the fact that I never received the NORTC
20 and the material disclosures.  Fairbanks was awarded attorney fees in the amount of
   15,000.00 and the costs associated with the arbitration in the amount of 15,000.00.(My
21 wages are currently being garnished to pay off the arbitration fees).

22

23    In March2007, I contacted Allison Brown at the FTC.  She gave me a full explanation
   regarding the Settlement Agreements.  She informed me that even though I did not opt-out
24

of the Class Action that I would benefit from the Default Resolution Program and the Operational Practice Changes. That under the Settlement Agreement, the Injunctive Relief, provision restrained and enjoined Fairbanks from taking any actions toward foreclosure without resolving all disputes and have met all the requirements for foreclosure. She explained to me that the Reserved Claims and Defenses could be used as a claim for wrongful foreclosure if Fairbanks did not comply with the Settlement Agreement, but all other claims had been Released for those Class Members who had their loans serviced between January 1, 1999 and the date of the Preliminary Approval of the Settlement Agreement (December 10, 2003). I informed her that I had been compelled to arbitration after the foreclosure by Fairbanks and she told me I needed to hire an attorney and inform them of the Settlement Agreement. The Settlement Agreement was my only recourse.

Shortly after the arbitration my oldest daughter ███ was murdered. It was a difficult time for me and my family and I lost track of all of the litigation. Not only did I lose my daughter, I now had to pay over 30,000.00 for the costs associated with the arbitration. My wages are currently being garnished by the American Arbitration Association.


My foreclosure was wrongful. I had the Right to Rescind my loan under TILA, for the failure to be provided a completed and proper NORTC and the material disclosures on the day that the loan closed. When I rescinded my loan, it was to stop the foreclosure and to get out of the predatory loan.

Both the lender and the servicer were properly noticed. Fremont Investment & Loan never responded to the rescission notice at all. If there were a dispute over my purported Right of Rescission, they should have filed a declaratory action within twenty(20) days not wait eighty(80) to respond to the notice and never came into play until 2005. There was a mandatory arbitration clause in the loan agreement designed to resolve any dispute. This never happened until March 2007.. Fairbanks took on the role of the ultimate decision-maker when they foreclosed. The Settlement Agreement provided for loan resolution programs and other options to foreclosure and Fairbanks failed to inform me of those options. Due to the fact that I was never noticed of the Settlement Agreements, I could not opt-out and therefore was bound by the Agreements. Fairbanks failed to operate with due diligence and in good faith in the resolution of my disputed rescission which resulted in the wrongful foreclosure and the loss of my home. The September 15, 2004 letter from Joe Huey, even indicated that if we could not resolve the Rescission dispute that I would file for bankruptcy protection to stop the foreclosure and he was still waiting to hear from American Residential Funding, Inc.. Fairbanks chose to foreclose anyway. This foreclosure could have been avoided if there had been sincere attempts made to negotiate a resolution by Fairbanks.. There was no way I could afford to continue to fight this battle once I lost my home, but I tried.

Fairbanks failure to resolve the matter in a timely manner resulted not only in a wrongful foreclosure, but financial ruin and emotional distress. After losing my home of fourteen (14) years my family in 2006 became homeless and had to move in with family friends.

39. The amount of emotional distress was devastating to me and my children. In order to establish a prima facie case of intentional infliction of emotional distress, the plaintiff must prove: the defendant acted intentionally or recklessly; the conduct was extreme and outrageous; the actions of the defendant caused the plaintiff emotional distress; the emotional distress suffered by the plaintiff was severe: Benningfield v. City of Houston, 157 F.3d 369 (5th Cir. 1998).   As a result of Fairbanks' actions I suffered actual economic, physical and emotional damages as did my family.

Fairbanks had other options to the foreclosure, to fulfill the requirement for foreclosure under the Settlement Agreements. The foreclosure was without the consideration that a family would be destroyed, their actions were evil and reckless. The last letter sent by Gallagher & Kennedy, was dated September 17, 2004 on a Friday. The house was sold on Tuesday September 21, 2004. The letter was sent to Joe Huey and not to me directly. I found out that my house had been sold when the new owner Robert Dean came to my home to evict me and stole the blueprints. I informed me that there was litigation surrounding my loan and he didn't care. Fairbanks knew that the consequences of their actions were certain to result in the loss of my family home. Fairbanks's conduct caused a lot of embarrassment, humiliation and worry for years because of their unreasonable and heinous actions. The ages of my ▇▇▇▇▇ at the time were ▇▇▇▇▇. The foreclosure occurred during the school year and was extremely disruptive to their education . I had to move my ▇▇▇▇▇ out of our family home of fourteen (14) years in five (5) days and forced to find a new place to live with a foreclosure on my credit. It was very hard to find a landlord who would rent to me. My finances were very unstable.

Under the Additional Terms (VII) of the Curry Settlement Agreement, the obligations of Fairbanks, shall be performed reasonably and in good faith. So long as it abides by the terms of the Settlement and performs reasonably and in good faith in carrying out the Agreement, the Default Resolution Program, and the Operational Practices, Fairbanks shall not be liable for erroneous, improper or inaccurate actions, omissions, crediting or payment, or breach of the Agreement, the Default Resolution Program, or the Operational

Practices, and the releases and any judgment shall be effective as of Final Approval as to every Plaintiff and Settlement Class Member   notwithstanding any error or dispute and regardless of whether such error or dispute is corrected or addressed only thereafter, unless such act or omission is a result of gross negligence or willful misconduct.  In the event a dispute arises concerning Fairbanks' performance of its obligations under the Agreement, Fairbanks shall have the right to cure (or commence cure within thirty(30) days of notice of the dispute) as to such act or omission that gave rise to the dispute, in which event Fairbanks shall have no liability for breach of the Agreement.

40.    Fairbanks was negligent when they foreclosed on me. A claim for  negligence , consists of the  following: (1) that the defendant( Fairbanks) owed a duty of care to plaintiff; (2) defendant breached that duty ; (3) defendant's breach was the actual and proximate cause of plaintiffs injuries; and (4) plaintiff was injured.  Scialabba v. Brandise Constr., 921 P.2d 928, 9230 (Nev.1996).  Liability based on negligence does not exist without a breach of duty.  Bradshaw v. Blystone Equip. Co. of Nev., 386 P. 2d 396, 397 (Nev.1963).

Fairbanks knew of the provisions of the Settlement Agreement, the Default Resolution Program and the Operational Practice Changes.  If they respected the TILA and the Settlement Agreements, they would not have foreclosed, they would have informed me that I was a Class Member of these Settlement Agreements, (we were in active concert in trying to resolve my Right of Rescission claim), and worked with me.  Fairbanks knew, that to file any claim after the Preliminary Approval Order, was Released.  Filing anything after that was a waste of my financial resources. They breached their duties of due diligence and good faith that was implied in the Settlement Agreements/contract with their willful misconduct and gross negligence.  Their actions caused injury, in that as a direct result of their actions and inactions in a timely manner.  That is why I am filing this lawsuit  for wrongful foreclosure as a Reserved Claims and Defenses under the intertwined Settlement Agreements.

There is absolutely no amount of money that can compensate my children and I for the emotional, financial, and mental damage that was fraudulently imparted on us. To lose your home as a result of loan fraud, notarial misconduct, and mortgage servicing fraud is cataclysmically devastating. The American Dream became the American Nightmare for our family.  After ten years of relentless research and an unyielding pursuit of justice, I am imploring that you recognize my fervent passion and grant my children and I the retribution we deserve.

Respectfully,

*Kathi Ann Sharpe*

Kathi Ann Sharpe          6-29-11

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
04/13/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2010-096145                                      04/11/2011

                                            CLERK OF THE COURT
HONORABLE KAREN POTTS                              M. Scott
                                                    Deputy


KATHI ANN SHARPE                       KATHI ANN SHARPE
                                       4763 E SUMMERHAVEN DR
                                       PHOENIX AZ  85044

v.

FAIRBANKS CAPITAL CORP                 FAIRBANKS CAPITAL CORP
                                       NO ADDRESS ON RECORD


MINUTE ENTRY

The Court has considered Plaintiff's motion to extend time for service, filed January 18, 2011.  It appears that this motion was pending when the Court dismissed this matter for lack of service.  Plaintiff failed to provided this Division with a copy of her motion, as required by local rule, and thus this Division was unaware the motion was pending.  For good cause appearing,

**IT IS ORDERED** vacating this order of dismissal dated **April 9, 2011**, which was erroneously entered while Plaintiff's motion was pending.

**IT IS FURTHER ORDERED** granting Plaintiff's motion to extend time for service. Plaintiff shall have until **June 30, 2011** to serve defendants.  This matter may be dismissed without further notice if service is not made by that date.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

| Office Distribution |
|---|

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

| **FILED** |
|---|
| 2/23/2011 |
| Clerk of the Court |

Ct. Admin
Deputy

2/19/2011                                COURT ADMINISTRATION

**CASE NUMBER:** CV2010-096145

Kathi Ann Sharpe

V.

Fairbanks Capital Corp

---

The Judge assigned to this action is the Honorable Karen Ann Potts

## 150 DAY ORDER

This action was filed more than 150 days ago. If there is any conflict between this order and any order from the assigned judge, the assigned judge's order governs. This order provides notice of requirements, pursuant to Rule 38.1, Arizona Rules of Civil Procedure. Rule 38.1 applies to all civil actions, including those subject to arbitration.

IT IS HEREBY ORDERED:

Rule 38.1 of the Arizona Rules of Civil Procedure will be strictly enforced. The parties shall file and serve on court and counsel the following documents:

1.  A motion to Set and Certificate of Readiness or an Appeal from Arbitration shall be filed on or before 6/20/2011. (The motion shall include an estimate of the length of trial) If Rule 38.1 is not complied with, the case will be placed on Inactive Calendar on the date shown above and it will be dismissed pursuant to Rule 38.1, without further notice, on or after 8/17/2011. *

2.  All parties' specific objections to witnesses and exhibits listed by other parties must be submitted with or stated in the Joint Pretrial Statement. Reserving all objections to witnesses or exhibits until time of trial will not be permitted.

LATE DISCOVERY. A Motion to set and Certificate of Readiness certifies that the parties have completed or will have had a reasonable opportunity to complete discovery within 60 days after the motion is filed. [Local Rule 3.4 and Rule 38.1 (f) Arizona Rules of Civil Procedure] Discovery should be completed in accordance with the Rule.

IF THIS IS AN ARBITRATION CASE. If this case is subject to mandatory arbitration, Rule 74 (b) of the Arizona Rules of Civil Procedure establishes the time for beginning the arbitration hearing. In light of the deadlines established by Rule 38.1 (d) of the Arizona Rules of Civil Procedure, counsel should be sure that arbitrators are timely appointed and that arbitrators complete the arbitration process within the time provided under Rule 38.1 (d) for motions to set. As Rule 76(a) of the Arizona Rules of Civil Procedure provides, an Appeal from Arbitration and Motion to Set for Trial serves in place of a Motion to Set and Certificate of Readiness under Rule 38.1 (a), Arizona Rules of Civil Procedure.

| Office Distribution |
| --- |

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

| **FILED** |
| --- |
| 2/23/2011 |
| Clerk of the Court |

Ct. Admin
Deputy

2/19/2011

COURT ADMINISTRATION

**CASE NUMBER:** CV2010-096145

Kathi Ann Sharpe

V.

Fairbanks Capital Corp

---

EXTENSIONS OF TIME TO SERVE PROCESS.  If there has been an extension of time to serve the summons and complaint, (a) Rule 38.1 still applies and (b) some parties and counsel may not receive a copy of this order.  Plaintiff should send copies to each of them and retain a copy of the transmittal letter.

ALTERNATIVE DISPUTE RESOLUTION.  Pursuant to Rule 16 (g), Ariz. Rules of Civil Procedures, counsel for the parties, or the parties if not represented by counsel, shall confer regarding the feasibility of resolving the parties' dispute through alternative dispute resolution methods such as mediation or arbitration with a mediator or arbitrator agreed to by the parties.  Counsel shall discuss with their clients the resolution of the dispute through an alternative dispute resolution method prior to the conference with opposing counsel.

*RELIEF FROM RULE 38.1 DEADLINES; CONTINUANCES ON INACTIVE CALENDAR.  The rules require a Motion to Set within nine months after the action is filed.  Discovery is to be completed about two months later (see Late Discovery above).  A motion to vacate or abate this order will not change the deadlines.  A premature Motion to Set violates Rule 11, Arizona Rules of Civil Procedures.

For good cause, the assigned judge may extend time for dismissal or continue the action on Inactive Calendar to an appropriate date.  If an arbitration hearing has been held, or is set in the near future, the date of that hearing should be included in any motion to extend Rule 38.1 deadlines or to continue on Inactive Calendar.  Stipulations to continue and delays for settlement negotiations are not good cause.  Except in extraordinary cases, the court will not grant trial continuances based on late discovery.

# Superior Court of Maricopa County - integrated Court Information System
## Endorsee Party Listing
Case Number: CV2010-096145

| Party Name | Attorney Name |
| --- | --- |
| Kathi Ann Sharpe | Pro Per |



# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

**FILED**
12/29/2010
Clerk of the Court

Ct. Admin
Deputy

12/25/2010

COURT ADMINISTRATION

**Case Number:** CV2010-096145

**Kathi Ann Sharpe**

**V.**

**Fairbanks Capital Corp**

The Judge assigned to this action is the Honorable Karen Ann Potts

## NOTICE OF INTENT TO DISMISS FOR LACK OF SERVICE

You are hereby notified that the complaint filed on 9/21/2010 is subject to dismissal pursuant to Rule 4 (i), Arizona Rules of Civil Procedure. The deadline for completing service is 1/19/2011. If no judge has extended time for completing service and no defendants have been served by this date, this case will be dismissed.

# Superior Court of Maricopa County - integrated Court Information System
## Endorsee Party Listing
Case Number:  CV2010-096145

| Party Name | Attorney Name |
| --- | --- |
| Kathi Ann Sharpe | Pro Per |

MICHAEL K. JEANES
Clerk of the Superior Court
By Shannon Stulz, Deputy
Date 09/21/2010 Time 16:58:44

| Description | Amount |
| --- | --- |
| ------- CASE# CV2010-096145 ------- | |
| CIVIL NEW COMPLAINT | 301.00 |
| TOTAL AMOUNT | 301.00 |
| Receipt# 20849469 | |

NAME: Kathi Ann Sharpe
ADDRESS: 4763 E. Summerhaven Dr.
CITY & STATE: Phoenix AZ
ZIP: 85044
PHONE: 480-248-6182

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

Kathi Ann Sharpe )
)
)
)
)
)
_____ )
            PLAINTIFF, )
)
            vs. )
)
Fairbanks Capital Corp. )
)
a Utah Corporation n/k/a )
Select Portfolio Service, Inc )
            DEFENDANT. )
            Servicing

CASE NO.: CV2010-096145

TITLE: ~~Breach~~ Complant
vs

_____

_____

_____


See Attached

X Kathi A. Sharpe
    9-21-10

Form #207  LRD 2/15/01  ALL RIGHTS RESERVED
© Clerk of Superior Court of Arizona in Maricopa County

# IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

|  |  |
|---|---|
| **KATHI ANN SHARPE,** | **CASE NO:** _____ CV2010-096145 |
| **Plaintiff,** | **COMPLAINT** |
| v. | 1. **Breach of Contract** |
|  | 2. **Negligence** |
| **FAIRBANKS CAPITAL CORP., a Utah** | 3. **Wrongful Foreclosure** |
| **corporation n/k/a SELECT PORTFOLIO** | 4. **Intentional Infliction of Emotional** |
| **SERVICES, INC., a Utah corporation.** | **Distress** |
| **Defendants.** |  |

Plaintiff, KATHI ANN SHARPE, *pro se*, hereby files this Complaint and alleges the following:

## PARTIES JURISDICTION AND VENUE

1.      At all relevant times, Fairbanks Capital Corporation (hereinafter "Fairbanks"), now known as Select Portfolio Services, Inc. (hereinafter "Select"), has been a Utah corporation authorized to do business in Maricopa County, Arizona.

2.      At all relevant times, Kathi Ann Sharpe (hereinafter "Plaintiff" or "Sharpe") has been a resident of Maricopa County, Arizona.

3.      This Court has jurisdiction over this matter pursuant to Article 6, Section 14 of the Arizona Constitution and A.R.S. § 12-123.

4.      Venue is proper in Maricopa County pursuant to A.R.S. § 12-401 as Plaintiff is a resident of Maricopa County and Defendant transacts business in Maricopa County.

## GENERAL ALLEGATIONS

5.     On or about March 25, 2002, American Residential Funding ("American"), the broker, met with Plaintiff at her former residence for the purpose of obtaining Plaintiff's signature on loan documents for the refinancing of Plaintiff's home, located at 12641 S. 34th Place, Phoenix, Arizona 85044 (hereinafter "the Property").

6.     American informed Plaintiff that there were no copies of the loan documents, but copies would be provided the next day.  Plaintiff objected but signed Notice of the Right to Cancel but did not date the Notice of Right to Cancel and would only agree to date it when she received copies of the loan documents.

7.     On or about April 1, 2002, without Plaintiff's knowledge and before she had received copies of all the refinancing documents to review, the loan was disbursed.

8.     On or about April 2, 2002, American provided Plaintiff copies of the documents she allegedly signed, however, the documents did not accurately reflect the terms verbally disclosed to her on March 25, 2002 during the closing; further, the Notice of Right to Cancel date had been filled in.

9.     Moreover, the dispute resolution agreement requiring Plaintiff to arbitrate any issues with Fairbanks was dated March 29, 2002 and signed by the representatives, however, Plaintiff did not get a copy of this until her loan documents were requested.

10.     On or about May 1, 2002, Fremont Investment and Loan Company (hereinafter "Fremont") began servicing the loan.

11.     On or about October 1, 2002, Defendant Fairbanks, now Select, became the assignee of the Fremont loan and began servicing the loan.

12.    On or about July 24, 2003, Plaintiff issued a written rescission demand to Fairbanks citing the failures, *inter alia*, of timely disclosure and the undated Notice of Right to Cancel and began to withhold payments in anticipation of her rescission.

13.    On or about November 13, 2003, Defendant Fairbanks denied that the disclosures were defective, refused to rescind the loan, and Plaintiff was in default.

14.    On or about December, 2003, Defendant Fairbanks, faced with numerous individual and class lawsuits and FTC and HUD enforcement actions, Fairbanks entered into a global settlement, with a private settlement agreement (hereinafter "the Settlement Agreement") and FTC Order negotiated contemporaneously and cooperatively. *Curry v. Fairbanks Capital Corp.*, filed in the United States District of Massachusetts, consolidates and settles 37 separate lawsuits, and the FTC consent order was filed in a related action in the same court.

15.    Members of the class action settlement agreement were those who had a home mortgage loan that was serviced by Fairbanks between January 1, 1999 to December 10, 2003 and were (1) in default or treated as being in default by Fairbanks and incurred or were assessed late fees or default-related fees, including corporate advances; (2) were affected by default-related conduct; incurred or were assessed certain prepayment penalties in violation of law or contract; or (3) were otherwise affected, or whose loans were otherwise affected, by one of the Covered Practices.

16.    Members of the class were invited to opt out of the settlement provided notice to opt out of the class was received by April 24, 2004.  If notice was not received by said date, but the borrower fit the definition of a class member, they were included in the class action settlement by default.

17.    The Settlement Agreement also included an Appendix which implemented the Default Resolution Program and Operational Practices Changes which required certain steps be carried out before Fairbanks could take the property from the borrower.  These steps were to be applied to all customers whom Fairbanks was servicing to ensure that Fairbanks was properly servicing the loans and followed all necessary steps before it foreclosed on the borrowers' property.

18.    The Settlement Agreement included a "reserved claims and defense" section which provided that a class member has the right to bring suit against the lender for failure to implement and follow the terms of the Settlement Agreement when dealing with a borrower.

19.    Plaintiff was a member of the class for settlement purposes as she had loans that were serviced during the set time and was in default when the loans were serviced, but never received notification to be included in the class group or opt out of the class group.

20.    In anticipation of recession, Plaintiff withheld the monthly payments to Fremont, which payments were in arrears at the time of Fairbanks' acquisition of the loan.

21.    Plaintiff and Fairbanks agreed to resolve the matter through arbitration which Fairbanks demanded on February 23, 2004.  On March 3, 2004, Fairbanks withdrew its demand for arbitration and recorded its second notice of trustee's sale on March 5, 2004.

22.    Fairbanks failed to provide Plaintiff the required protections illustrated in the Default Resolution Program and Operational Practices Changes appended to the Settlement Order and the property was sold at auction for substantially less than its fair market value on September 21, 2004.

23.    On or about March 31, 2005, Plaintiff filed a civil law suit against American, Fremont, Fairbanks and Select in Maricopa County Superior Court, *Sharpe v. Fremont Investment*

1  & *Loan Co.*, CV 2005-050282, alleging Fraud RESPA, TILA violations and wrongful foreclosure

2  based on those violations.

3       24.   Fairbanks never informed Plaintiff or Plaintiff's counsel about the Settlement

4  Agreement it entered into for *Curry v. Fairbanks Capital Corp.* thus depriving Plaintiff of availing

5  herself to the remedies appended to the Settlement Agreement.

6       25.   On or about June 29, 2005, Fremont filed a Motion to Dismiss or Compel

7  Arbitration, based upon an arbitration provision in the loan document.

8       26.   On or about October 26, 2006, the Superior Court Action was assigned to

9  Arbitrator Marc Kalish and designated as American Arbitration Association case number 76 148

10  00115 06 HIIB (hereinafter "the Arbitration").

11       27.   On or about September 11, 2007, Arbitrator Kalish issued an arbitration award in

12  favor of American, Fremont, Fairbanks and Select, dismissing Plaintiff's claims with prejudice.

13       28.   Plaintiff and Fremont entered into a settlement agreement where Plaintiff agreed

14  not to pursue any legal action against Fremont and Fremont agreed not to collect any attorneys'

15  fees from Plaintiff.

16       29.   On or about February 4, 2008, Select moved for and was awarded attorney's fees

17  for the Arbitration.  A judgment was entered against the Plaintiff for $15,000.00 and her income

18  was and continues to be garnished $150.00 per month because of this award.

19                          **FIRST CAUSE OF ACTION**
                            **BREACH OF CONTRACT**

20       30.   Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1

21  through 29, inclusive, as though set forth fully herein.

22       31.   Defendants entered into a Settlement Agreement in which Plaintiff was included by

23  default as a class member.

24

32.  Defendant agreed to perform certain actions when servicing loans such as Plaintiff's and carry out the terms of the Settlement Agreement with due diligence and good faith.

33.  Defendant did not exercise good faith and due diligence when it failed to afford Plaintiff the protection it agreed to provide borrowers under the Settlement Agreement.

34.  The Defendant's breach caused Plaintiff's house to be sold at foreclosure.

35.  As a result of this breach, Plaintiff has suffered and continues to suffer economic and non-economic damages subject to proof at trial.

36.  Plaintiff further seeks restitution, disgorgement of sums wrongfully obtained, costs of suits, reasonable attorney's fees, and such other and further relief as the Court may deem just and proper.

## SECOND CAUSE OF ACTION
## NEGLIGNECE

37.  Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 36, inclusive, as though set forth fully herein.

38.  Defendant owed a duty of reasonable care to Plaintiff to follow the terms of the Default Resolution Program and Operational Practiced Changes.

39.  By its aforementioned acts and omissions Defendant breached its duty of reasonable care owed to Plaintiff and caused damages to Plaintiff.

40.  As a result of the aforementioned acts and omissions by Defendant, Plaintiffs have suffered and continue to suffer damages in an amount in excess of ten thousand dollars ($10,000.00) with a final determination to be made at trial.

### THIRD CAUSE OF ACTION
### UNLAWFUL FORECLOSURE

41.  Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 40, inclusive, as though set forth fully herein.

42.  Fairbanks was required to follow the steps outlined in the Default Resolution Program and Operational Practiced Changes before it sold Plaintiff's property at foreclosure.

43.  Contrary to the Settlement Agreement, Defendant did not provide the Plaintiff any options listed in the Default Resolution Program and Operational Practiced Changes even though Plaintiff was a member of the protected class of borrowers.

44.  Further, in September of 2004, Defendant foreclosed on Plaintiff's property then moved Plaintiff into arbitration without exploring any of the options available for borrowers in the appendix to the Settlement Agreement it entered into in November of 2003.

45.  Because Defendant failed to give Plaintiff the benefits of the Settlement Agreement of which she was a class member, Plaintiff's house was wrongfully sold at foreclosure.

46.  As a direct and proximate result of Defendant's failure to follow the terms of the Settlement Agreement, Plaintiff has been damages in an amount to be proved at trial.

### FOURTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

47.  Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 46, inclusive, as though set forth fully herein.

48.  By Defendant's act of foreclosing on Plaintiff's property without following the terms of the Settlement Order, Defendant intended to cause Plaintiff emotional distress or recklessly disregarded the risk that Plaintiff would suffer emotional distress.

1    49.    The Defendant caused the foreclosure sale of Plaintiff's property with reckless

2   disregard that the act of foreclosing on Plaintiff's property without following the terms of the

3   Settlement Agreement with reckless disregard that the probability that doing so would cause

4   emotional distress to Plaintiff.

5    50.    The actions of Defendant caused Plaintiff to suffer emotional distress and she was

6   injured by this distress, the amount of which is to be proved at trial.

7    **WHEREFORE**, Plaintiff having set forth the claims for relief against Defendants

8   respectfully prays that this Court grant the following relief against the Defendants:

9        1. Actual economic and non-economic Damages;

10       2. For damages as provided by statute;

11       3. For costs and reasonable attorney's fees pursuant to Arizona Revised Statutes;

12       4. For such other and further relief as the Court may deem just and proper.

13       5. For punitive damages.

14   Dated:  September 21, 2010.

15       RESPECTFULLY SUBMITTED this 21 day of September, 2010.

16

17

18   By: _Kathi Ann Sharpe_
     Kathi Ann Sharpe, *Pro Se*

19

20

21

22

23

24

MICHAEL K. JEANES, CLERK
BY ⟨signature⟩ DEP
FILED
10 SEP 21   PM 4: 56

1 | Kathi Ann Sharpe
4763 E. Summerhaven Drive
2 | Phoenix, AZ 85044

3 | *Plaintiff Pro Per*

4

5 |              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

6 |                 **IN AND FOR THE COUNTY OF MARICOPA**

7 | **KATHI ANN SHARPE,**            Case No.:   **CV2010-096145**

8 |              **Plaintiff,**       CERTIFICATE OF
                                       COMPULSORY ARBITRATION
9 |              **vs.**

10 | **FAIRBANKS CAPITAL CORP., a Utah
corporation n/k/a SELECT PORTFOLIO**
11 | **SERVICES, INC., a Utah corporation.**

12 |              **Defendants.**

13

14 |        The undersigned certifies that the largest award sought by Plaintiff, including

15 | punitive damages, but excluding interest, attorney's fees and costs, includes injunctive

16 | relief and DOES exceed the limits set by Local Rule for compulsory arbitration. This case

17 | IS NOT subject to the Rules of Procedure for Arbitration.

18 |        RESPECTFULLY SUBMITTED _21 st_ day of September, 2010.

19 |                                 ⟨signature⟩
                           By: _____
20 |                                Kathi A. Sharpe
                                    Plaintiff Pro Per
21

22

23

24

-1-